# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DEBORAH ARTILES, | |
| *Plaintiff*, | |
| v. | Civ. Action No. 06-5427 (KSH) |
| NICOLO A. VITANZA; ROBERT CARPENTER; CHRISTOPHER MARTINO; STEPHEN W. GALLAGHER; THE TOWNSHIP OF HANOVER; | **OPINION** |
| *Defendants*. | |

**Katharine S. Hayden, U.S.D.J.**

## I.     INTRODUCTION

This § 1983 action arises from the November 20, 2004 arrest of plaintiff Deborah Artiles. Artiles seeks damages against the Township of Hanover, New Jersey ("Township") and several law enforcement officers employed by the Hanover Police Department ("HPD"):  Stephen W. Gallagher, the Township's Chief of Police; and Robert Carpenter, Nicolo Vitanza, and Christopher Martino, all officers of the HPD.[1]  Specifically, Artiles alleges that the latter three officers violated her rights under the Fourth Amendment to the United States Constitution by: (1) unlawfully arresting her without probable cause; (2) using excessive force in doing so; and

---

[1] Artiles asserted Counts Three and Six of the fourth amended complaint (the "complaint") [D.E. # 16] against two individuals employed by the Morris County Correctional Facility ("MCCF"), but has since withdrawn those claims with prejudice [D.E. # 32, 40].  Summary judgment on those counts is therefore granted without further discussion.  Unless individually referenced, the Court will refer to Carpenter, Vitanza, and Martino collectively as the "officers." Where relevant, the Court will refer to all defendants collectively as "defendants."

(3) maliciously causing her to be subjected to a baseless prosecution thereafter.  Artiles alleges further that the collective failure of the Township and Gallagher properly to train, supervise, reprimand, or discipline the officers constituted a *de facto* policy to acquiesce in their unconstitutional conduct, which is also actionable under § 1983.  Finally, Artiles asserts state-law claims against the officers for false arrest/false imprisonment, assault and battery, malicious prosecution, malicious abuse of process, and intentional infliction of emotional distress.

Defendants now move for summary judgment [D.E. # 42].  As isn't always the case, the Court has before it substantially more than a cold record comprised only of transcripts, reports, exhibits, and briefs.  This record is augmented by audio and video recordings providing context to the events surrounding the November 20, 2004 incident.  Based on all of the evidence adduced, and for the reasons that follow, defendants' motion is granted.

## II.   JURISDICTION

The Court has federal question jurisdiction because Artiles' complaint raises issues of federal constitutional law and alleges a deprivation of constitutional rights by officers acting under color of state law.  28 U.S.C. §§ 1331, 1343; 42 U.S.C. § 1983.   Supplemental jurisdiction exists over her state-law claims.  28 U.S.C. § 1367(a).  Venue is proper as well, since all acts giving rise to Artiles' claims occurred within this district.  28 U.S.C. § 1391(b).

## III.   STANDARD OF REVIEW

"A party against whom relief is sought may move . . . with or without supporting affidavits, for summary judgment on all or part of the claim."  Fed. R. Civ. P. 56(b).  However, the judgment sought shall be rendered only if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When a party moves for summary judgment, the non-moving party must then provide "specific facts

showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e).  An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Fowle v. C&C Cola*, 868 F.2d 59, 61 (3d Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  To determine whether there is a genuine issue for trial, "all justifiable inferences are to be drawn in" the favor of the non-movant.  *Anderson*, 477 U.S. at 255; *see also Gray v. York Newspapers*, 957 F.2d 1070, 1078 (3d Cir. 1992).  Defendants' burden "may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Therefore, the Court may not grant defendants' summary judgment motion if there is sufficient evidence to allow a reasonable jury to return a verdict for Artiles, *see Anderson,* 477 U.S. at 248, or if the factual dispute is one "that might affect the outcome of the suit under the governing law . . . ." *Id.*

Under the doctrine of qualified immunity, officers named in a § 1983 action who performed discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity analysis is a double-faceted inquiry.  The Court must ask whether the facts alleged, viewed in the light most favorable to Artiles, show that the defendants' conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the court answers this question affirmatively, it must then determine whether the right was clearly established, *i.e.*, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

In *Wright v. City of Philadelphia*, 409 F.3d 595 (3d Cir. 2005), the Third Circuit grappled with an as-of-then unanswered question:  Whether the analysis prescribed by *Saucier* is best described as a constitutionality-qualified immunity two-step, or whether constitutional review of a plaintiff's claims is only the first inquiry under the penumbra of a larger "Qualified Immunity" doctrine.  *Wright*, 409 F.3d at 600 ("Specifically, the dispute is whether a court must determine the issue of whether there has been a constitutional violation before reaching the qualified immunity question, or whether that inquiry is the first part of a two-pronged test for qualified immunity."); *see also id.* at 604-07 (Smith, J., concurring). The majority opinion in *Wright* did not definitively answer the question, but utilized the latter approach under the circumstances of the particular case as it presented itself on appeal.  *Id.* at 601.  The United States Supreme Court recently held that the *Saucier* inquiry is no longer mandatory, and that "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two *prongs of the qualified immunity analysis* should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S. Ct. 808, 813 (2009) (emphasis added).  *Pearson* thus makes clear that the majority in *Wright* got it right. "Qualified Immunity" consists of two prongs:  Whether a constitutional right was violated, and whether that right was clearly established.  Here, the Court sees no reason to depart from *Saucier*, and it thus asks first whether a constitutional right was violated, and if and only if the answer is yes, whether the right was clearly established at the time.  If the answer to either inquiry is no, qualified immunity is appropriate.

4

IV.    **FACTS & PROCEDURAL HISTORY**

A.  *Preliminary Note*

Facts stated herein have been taken from the complaint, the parties' legal memoranda, and affidavits and exhibits submitted in support thereof.  Counsel for each side have submitted statements of material fact that do not comply with Local Civil Rule 56.1  Defendants' counsel have submitted within the moving brief a statement of facts with separately numbered paragraphs.  Defendants' Brief in Support of Motion for Summary Judgment ("Def. Br.") at 4-10.  *See* L. Civ. R. 56.1, cmts. 1, 2(b) ("[A] party moving for summary judgment must file a document separate from its brief containing a statement of undisputed facts or face dismissal of the motion . . . ."; "Under the 2008 amendments to L. Civ. R. 56.1(a), each party's statement of undisputed facts . . . must be a document separate and apart from the legal briefs.").  Despite this technical noncompliance with the recently amended local rule, dismissal of the motion to require defendants to re-move and separate the statement of facts from the brief would serve no useful purpose.  *See Inductotherm Indus. v. United States*, No. 99-2451, 2002 U.S. Dist. LEXIS 14046, at *5 n.1 (D.N.J. Mar. 26, 2002) (Rodriguez, J.) (foregoing dismissal of summary judgment motion for failure to provide statement of material facts).

Counsel for plaintiff, Steven A. Hershkowitz, however, has submitted a responsive statement that lacks substantive compliance with the local rules.  Rather than separately enumerate responses to defendants' fact statement, Hershkowitz interweaves a hyperbolic narrative of facts within the brief.  Plaintiff's Brief in Opposition to Motion for Summary Judgment ("Pl. Opp. Br.") at 4-14.  To the extent that the responsive statement does not directly reply to a particular enumerated fact in defendants' statement, the Court deems that statement unopposed.  L. Civ. R. 56.1.  The brief submitted by Hershkowitz is also objectionable for

5

counsel's inclusion of such incendiary remarks as accusing an officer of "sounding very much like a **<u>psychopathic megalomaniac</u>** (emphasis and underline in original)," likening that same officer to a "wife-beater who hits where the bruises won't show," and condemning the HPD for operating as an "intra-departmental 'goon squad.'" *See* Pl. Opp. Br. at 2, 13.

### B.  Plaintiff's Prior Interactions with Defendants

At all times relevant here, Artiles resided in a condominium located at 3502 Appleton Way in Whippany, New Jersey.  Def. Br. at 4.  The causes of action alleged in Artiles' complaint concern events that occurred on November 20, 2004.  As background evidence, Artiles asserts that she has a history with the HPD (and in particular, Martino and Vitanza) related to ongoing quarrels with a former boyfriend that had begun before the date of the incident precipitating this lawsuit.  Compl. ¶ 24.  Artiles alleges in her complaint that the officers "had attempted to suborn [her] to falsify allegations in support of criminal charges which [they] wanted to proffer against [her] former boyfriend."  Compl. ¶ 24.  She claims that on a particular evening before the date of the incident, certain officers with the HPD (including Martino) were called to her residence regarding a domestic dispute.  Affidavit of Deborah Artiles ("Artiles Aff.") ¶ 7.  She asserts that she explained to the officers that there had only been a misunderstanding and that she did not want her ex-boyfriend to face prosecution, but that Martino ignored her and "insisted that, because the matter was a 'domestic dispute,' he would arrest [her] [boy]friend and force [her] to testify against him."  *Id.* ¶¶ 8-9.  She further claims that because she kept her "word and refused to prosecute, and because [she] complained to . . . Vitanza about how [she] had been treated by . . . Martino, both . . . Martino and Vitanza became abusive and insulting."  *Id.* ¶ 10.  At some point, Artiles filed a citizen complaint against Martino related to the incident, which was

ultimately dismissed.  Certification of Steven A. Hershkowitz ("Hershkowitz Cert.") Ex. C at 68:3-69:7; Ex. E at 5 (police report completed by Carpenter).

The resolution of the continuing domestic dispute (and other instances in which HPD officers responded to various disturbances at Artiles' residence) is unclear on the record, and the specific contours are not material here.[2]  It appears that the HPD responded about four times to incidents involving Artiles at her residence (which concerned altercations with her daughter as well as her ex-boyfriend).  McCarthy Aff. Ex. C at 10:5-9.

### C.  The Telephone Calls on November 20, 2004

The audio recordings of the various telephone calls made on November 20, 2004 comprise a fundamental component of the record evidence.[3]  In considering the motion now before it, the Court has had occasion to listen to these recordings—and to listen to them again. The recorded calls, alone and in conjunction with the other available evidence, reveal that it was Artiles—not defendants—who originated, misrepresented, and escalated the material events that

---

[2] In connection with her assertion that the defendant officers harbored a pre-existing animus against her, counsel for Artiles cites only a fraction of the numerous depositions taken during discovery.  *See* Plaintiff's Brief in Opposition to Motion for Summary Judgment ("Pl. Opp. Br.") at 4-5.  The brief makes general allegations as to defendants' subjective mindset, without providing detailed citations to the record, a statement of material facts compliant with L. Civ. R. 56.1, or any other specific allegations in her papers.  Having scoured the record with little help from plaintiff's counsel, the Court has extracted all material facts relevant to the parties' prior interactions.  As Judge Alfred M. Wolin (ret.) of this District stated in a similar situation, "[t]he Court has done its best to examine the materials before it. To the extent that the lack of [an adequate] Statement of Undisputed Facts [and other supporting materials] ha[ve] hampered this process, any complaint that some piece of evidence was overlooked . . . is correspondingly attenuated."  *Clawans v. United States*, No. 98-3053, 2000 U.S. Dist. LEXIS 18808, at *39 (D.N.J. Dec. 26, 2000) (Wolin, J.).

[3] Accurate transcriptions of the calls appear at Exhibits E and J to the McCarthy Affidavit.  An audio disk containing the recorded calls was submitted to the Court as Exhibit K.

ultimately resulted in her arrest.  They also demonstrate that Artiles had contemplated this civil action well before defendants exerted any force upon her under color of law.

In the early evening on Saturday, November 20, 2004, Artiles returned home from her job as a realtor, ate dinner and drank a glass of wine.  McCarthy Aff. Ex. A at 171:1-25.[4]  Tired, she took two sleeping pills and went to bed, at which time she alleges that the couple in the unit above her began making incessant banging noises.   Compl. ¶¶ 26-27; Affidavit of Deborah Artiles ("Artiles Aff.") ¶ 11; Artiles 1/22/08 Dep. at 113:1-4.   At approximately 8:20 p.m., Artiles called HPD's central telephone line to complain about the alleged noise coming from upstairs.  Dispatcher Collora—who was responsible for receiving calls to both the central and emergency lines—answered this call.   Artiles explained to Collora that there were people upstairs from her whom she had "put up with" for a very long time and that these people had called the police on her before.  She declared that she was "sick and tired" of them waking her up early in the morning.  Dispatcher Collora interrupted by asking with whom he was speaking; Artiles refused to give this information because, she explained, when her neighbors had previously called the police to complain about her, they had not provided their information. Collora inquired where the caller lived and from where the noise was coming, and Artiles responded—falsely—that she lived at "3505 Whipa – Uh, Eden Lane," and that the noise was coming from 3506 Appleton Way.   Apparently confused between Artiles' contradictory responses with respect to her location, Collora stated to her that she had just given him two different addresses.  Beginning to raise her voice, Artiles clarified that she lived on Appleton Way in Eden Lane and that the noise started at 5:00 a.m. and ended at 11:00 p.m. or midnight

---

[4] Artiles' January 22, 2008 deposition appears as Exhibit A to the McCarthy Affidavit.  Her February 18, 2008 deposition appears as Exhibit H to the McCarthy Affidavit.  Hereafter, the Court refers to these exhibits as "Artiles 1/22/08 Dep." and "Artiles 2/18/08 Dep.," respectively.

every night.  Collora then attempted to confirm what he believed to be the caller's location (3505 Appleton Way) and source of the noise (3506 Appleton Way), and advised Artiles that HPD would send a car down.  She responded, "Yeah, thank you."  Collora then asked again what the caller's name was, at which time Artiles became irate and began to shout that previous callers did not give their names when they called to complain about her.  Still shouting, she repeated her complaint that she was sick and tired of being woken up at 6:00 a.m.  Raising his own voice, Collora warned Artiles to stop yelling at him, said goodbye, and hung up the phone.

Immediately after this first call, Collora called Vitanza on an internal HPD line to complain that he had just gotten an "earful" from Artiles, whom he referred to as Vitanza's "girlfriend" (an apparent reference to Vitanza's previous encounters with her), and announced that if Artiles ever called again and yelled at him when he asked for her name, he would file a complaint against her.  Vitanza replied that Artiles was "your girlfriend, not mine," and that she was a "mental patient."

Twelve minutes after making her first call to the HPD, Artiles dialed 911 at approximately 8:32 p.m., and again spoke—anonymously—to Collora.  She stated that she believed there was an emergency at 3206 Appleton Way.  Correcting her, Collora asked if she meant to say 3506.  Artiles responded affirmatively and noted that there was "a serious problem up there" because she heard "all this banging."  Collora stated that HPD had already received a call on the matter, and that an officer had been dispatched to the scene.

As a result of Artiles' calls to the HPD and to 911, Vitanza, Carpenter, and a Patrolman Hermans were dispatched to 3506 Appleton Way to investigate the noise complaint.  Def. Br. at 5; McCarthy Aff. Ex. E.  The officers questioned the only two residents of the condominium above Artiles, Brian and Katherine Liccardo, who stated that they had been kneading pizza

9

dough and that nothing was wrong.  Def. Br. at 5; McCarthy Aff. Ex. E.  Having determined that

no emergency existed at the Liccardos' residence, Carpenter and Hermans proceeded downstairs

to speak with Artiles while Vitanza questioned the Liccardos' neighbor (at 3505 Appleton Way,

the address from which Artiles had stated she was calling during the first call to HPD)

concerning the noise complaint.  Vitanza testified at his deposition that the Liccardos' neighbor

stated that she was not the one who had called HPD and that she believed it was the "blonde

female in 3502 who probably used her address."  Hershkowitz Cert. Ex. B at 74:10-15.  Vitanza

also stated that Artiles refused to answer when the officers knocked on the door, that he yelled to

her not to call 911 unless there was an emergency, and that they had spoken to her neighbors

who had indicated that she was the one causing the problem.  *Id.* at 73:14-18; *see also* Compl. ¶

32.  The officers then left the scene.  Def. Br. at 5; McCarthy Aff. Ex. E.  There is some

indication in the record that the officers returned a second time to investigate, but this is neither

clear nor material.  *See* Hershkowitz Cert. Ex. B. at 92:14-24.

        Katherine Liccardo testified that Brian was in the kitchen making pizza early in the

evening on November 20, 2004 and that she was in the living room watching television when

they both heard a loud banging in the kitchen coming from the apartment below.[5]  Katherine

Dep. at 9:3-12.  Not knowing what it was, she testified that they ignored the sound initially, but a

few minutes later Artiles began banging on the ceiling again.  *Id.* at 9:13-14.  Katherine testified

that Artiles was yelling and cursing for them to "shut the f*ck up" and would not stop hitting the

ceiling.  *Id.* at 9:15-19, 12:24-13.  She stated that she did bang on the floor momentarily in an

---

[5] The separate depositions of the Liccardos both appear in the McCarthy Affidavit as Exhibit C.
For ease of reference, the Court refers to the "Katherine Dep." and the "Brian Dep.,"
respectively.

10

attempt to get Artiles to stop banging and that she considered going downstairs to speak with Artiles, but she did not do so because she was "a little nervous around her." *Id.* at 9:20-25. She averred that whatever noise her husband was making was not out of the ordinary and that Artiles was overreacting. *Id.* at 12:5-10. Brian corroborated his wife's testimony, stating that on the night in question, he was kneading pizza dough when Artiles began yelling obscenities (specifically, "shut the f*ck up") and banging on the ceiling. Brian Dep. at 12:9-14:2. Katherine testified that she was "shocked" that the police had been called to their apartment to investigate what the police told them had been two different noise complaints. Katherine Dep. at 12:17-21, 14:2-15:10. She stated that when the officers arrived, she and Brian let them in to check out the condominium, and upon leaving the unit, she heard them proceed downstairs to Artiles' unit and the unit across the hall (3505 Appleton Way). Katherine Dep. at 14:21-20:6.

His suspicions aroused after the investigation at the condominium complex, Vitanza returned to HPD headquarters and listened to the recordings of the first two calls for comparison, and confirmed that Artiles had made both calls. McCarthy Aff. Ex. B. at 75:7-77:5. At approximately 9:40 p.m., a little over an hour after she made the first two calls, Artiles again called the HPD's central telephone line. She identified herself to Collora and this time gave her correct address (3502 Appleton Way). Collora asked her to hold on, at which time Artiles asked whether she should record the conversation. When Collora asked her what she wanted, Artiles stated that she wanted to know why people came to her door when in fact it was someone else who was harassing her. Vitanza then got on the line and explained that because she had refused to talk to them when they had arrived at her residence, he was preparing to charge her with filing a false 911 report. Artiles reacted incredulously, and exclaimed—falsely—that she did not "know who the hell called" HPD, but that it might have been another person. Vitanza stated that

11

he knew it was her voice, and asked Artiles if she had an emergency.  Artiles responded with the following:

| | |
|---|---|
| ARTILES: | Do I have an emergency?  Are you people crazy?  Do you want a – do you want a like lawsuit that I'll be a multimillionaire when you're done?[6] |
| VITANZA: | This call is being terminated.  Thank you.  Goodbye.  Don't call again.  You are harassing us. |
| ARTILES: | I'm harassing you?  You were at my front door tonight for no reason. |
| VITANZA: | Once again I will add harassment to the charges. |
| ARTILES: | Oh, you're – to the charges for, for yeah. |
| VITANZA: | Goodbye. |
| ARTILES: | Ha ha. |

McCarthy Aff. Ex. B.  Two minutes later, at 9:42 p.m., Artiles again called HPD's central telephone line, and Vitanza answered the call.  Artiles again threatened a lawsuit against HPD, and Vitanza advised that he was sending officers to her residence to place her under arrest.  *Id.*

After this call, Vitanza called Hanover Municipal Judge Brian O'Toole at home in order to procure a warrant for Artiles' arrest.  The conversation between Vitanza and Judge O'Toole demonstrates that the two were familiar with each other; Vitanza refers to himself as "Tony," and Judge O'Toole calls Vitanza "Vito."  Vitanza described Artiles to the judge, reminding him that she had been involved in a couple of domestic disturbances the previous year.  He then explained to Judge O'Toole that Artiles called the dispatcher on HPD's regular line, identified herself as a neighbor and complained that the people upstairs were making noise.  He then stated that they

---

[6] In this lawsuit, Artiles seeks $26 million dollars in compensatory and punitive damages against defendants.  Compl. ¶¶ 55-83.

dispatched a squad car to investigate, but that it did not get there right away.  Vitanza related to

Judge O'Toole that Artiles called 911 a few minutes later and stated that she believed there was

an emergency.  He stated that once the officers had arrived at the residence to investigate, they

discovered that the upstairs neighbors (the Liccardos) had only been making pizza and that there

was no emergency, a fact that was corroborated by the other neighbor (who actually resided at

3505 Appleton Way).  Because he believed that she had called reporting an emergency when

there was no emergency, Vitanza advised Judge O'Toole that he wanted to charge Artiles with

making a false 911 call, and the judge agreed that such a charge was appropriate.  Vitanza then

recounted Artiles' telephone calls after the officers had been dispatched to the condominium

complex, that she was "screaming and yelling" at them, and that she falsely claimed that

someone else had called 911.  Because Artiles had refused to come to the door, Vitanza stated

that he would like to put the charge on a warrant because of her "obnoxious behavior."  Judge

O'Toole agreed, and stated that he "absolutely should" swear out such a warrant.

Moving to the subject of bail, Judge O'Toole asked Vitanza whether Artiles should be

released on her own recognizance or whether she should have to post some amount of bail.

Vitanza suggested that he was not looking for anything "stupendous," but that he thought Artiles

should have to "post a little" because she had been a "pain in the ass."  Judge O'Toole asked

whether $5,000 bail with a 10% cash requirement was appropriate, and Vitanza stated that such a

requirement would suffice.  Judge O'Toole then suggested to Vitanza that Artiles might not open

the door, but that if she was a "public menace" he could authorize the officers to break her door

down.  Before Vitanza answered, however, Judge O'Toole stated that he did not think that such

force was not necessary at that time, a point with which Vitanza agreed.  Judge O'Toole then

stated that if there was a public emergency or a "life and limb cut situation" it might be different,

but that there was no need to escalate the situation for fear that Artiles would "take a swing" at one of the officers.  Vitanza again agreed, declaring that there was no need to "get in over our heads."  Judge O'Toole concluded the conversation by advising Vitanza that he was at home if Vitanza needed him further.  During their conversation, Judge O'Toole did not administer an oath to Vitanza.

After speaking with Judge O'Toole, Vitanza informed Carpenter over the radio that "Artiles made multiple 911 calls reporting a false emergency and that he was typing up the complaints at th[at] time."  McCarthy Aff. Ex. E; Hershkowitz Ex. B at 92:2-25.  The complaint warrants that were ultimately generated—and signed by Vitanza upon oath—were signed by a proxy for Judge O'Toole (the signatory's name appears on the signature line, followed by the words "as per Judge"), as well as another officer who had administered the oath.  McCarthy Aff. Ex. F.  The complaint warrants indicate that Judge O'Toole had set bail, and that probable cause had been found in support of their issuance.  *Id.*

Carpenter, Martino, and Hermans proceeded to 3502 Appleton Way to arrest Artiles, and Vitanza stayed back to fill out the complaint warrants.[7]  Hershkowitz Cert. Ex. B. at 92:22-24. The record is somewhat unclear whether Vitanza himself returned to Artiles' residence a second time.  Vitanza's deposition testimony seems to indicate that he did proceed to the residence a second time, after he had spoken to Judge O'Toole.  *See* Hershkowitz Cert. Ex. B. at 92:14-24.

_____

[7] There is also evidence in the record, consistent with the recorded calls, that Vitanza called Artiles' residence from his office phone—before she called 911 the second time, *see infra*—and began to leave a message on her voicemail that "her best course of action would be to open the door."  Hershkowitz Cert. Ex. B at 94:1-5; Artiles 1/22/08 Dep. at 149:19-150:21.  Vitanza testified that while he was leaving the message, Artiles picked up the phone, began "yelling and screaming, and that [HPD would] be sued."  Hershkowitz Cert. Ex. B at 94:7-9.  This phone call was not recorded, but was corroborated by Artiles' deposition testimony.  Artiles 1/22/08 Dep. at 149:19-150:21.

In any event, by the time the officers entered the residence to arrest Artiles, Vitanza had left the scene and returned to police headquarters. *Id.* at 93:19-96:7; Artiles 1/22/08 Dep. at 153:15-17. As Martino, Carpenter, and Hermans arrived on the scene, at approximately 10:26 p.m., Artiles called 911 for the second time. She stated that she needed help from the police, who were going to hurt her. She said that the police were mad at her because she, as an "abused woman," would not press charges against her boyfriend. The dispatcher asked whether it was an emergency. Raising her voice, Artiles said that her ex-boyfriend wanted to kill her but because she did not want to press charges, the police wanted to hurt and arrest her. The dispatcher told Artiles that the police meant her no harm, and emphasized that she had called 911 again. Artiles again said that she just wanted to be left alone, but the police wanted to arrest her because her boyfriend had "beat [her] senseless." The dispatcher then informed her that the officers would seek authorization to knock her door down if she did not step outside to allow the officers to place her under arrest.

Meanwhile, because Artiles would not initially open the door upon the officers' request, Martino and Hermans—who had arrived on the scene to assist with the arrest—left to return to their patrol car while Carpenter stayed at the scene. Hershkowitz Cert. Exs. C at 25:25-26:19; B at 92:25-93:6. At some point, Artiles finally opened the door, at which time Carpenter proceeded inside to place her under arrest. Def. Br. at 6; McCarthy Ex. E. Martino and Hermans returned to the residence at this time to provide assistance. Hershkowitz Cert. Ex. C at 26:25. The record is somewhat unclear whether they arrived before, during, or after the actual arrest.

### D. The Arrest and Aftermath

Upon permitting Carpenter to enter her residence to effect the arrest, Artiles "took one step back." Artiles 1/22/08 Dep. at 155:22-157:25. She testified at her deposition that she

believed three officers were at the scene, but that only two officers, Carpenter and Hermans,

entered when she opened the door.  *Id.* at 155:13-14.  Carpenter's police report states that the

following occurred upon his entrance:

> I entered the residence and Artiles sat down on the stairs.  I advised
> her that she was being arrested for reporting a false emergency via
> 9-1-1.  Artiles was completely uncooperative . . . .  Artiles refused
> to comply when I ordered her to stand up and put her hands behind
> her back.  I handcuffed Artiles' right wrist and turned her around to
> handcuff her left wrist.  Artiles refused to turn around and held her
> left wrist to prevent me from bringing her left wrist behind her
> back. . . .  Artiles refused to put on any footwear, however[,] we
> brought slippers to headquarters for her along with her purse. . . .

McCarthy Aff. Ex. E.  The structure of her condominium unit is contrary to her claim that she

took "one step back"; the stairs upon which she sat down are approximately 20 feet from the

entrance.  McCarthy Aff. Ex. L at 12.  Artiles testified that when Carpenter handcuffed her, she

did not attempt to pull or run away.  Artiles 1/22/08 Dep. at 158:22-159:4.  She stated, consistent

with Carpenter's report, that Hermans, who by this time had arrived on the scene, went to her

upstairs bedroom and retrieved her slippers and purse.  *Id.* at 159:5-160:19.  She claimed that

Hermans did not give her an opportunity to put her slippers on.  *Id.* at 159:10-16.  As the officers

escorted her outside, she avers that "[t]hey start[ed] dragging me down the stairs and outside into

the cold."  *Id.* at 162:5-6.  When asked what she meant by "dragging down the stairs" meant, she

answered, "[t]hey were yanking me, pulling me by – you know, my arms grabbing me by my

arms. . . .  They're pulling me down the stairs – each one has me gripped by [my] arms and

they're taking me to the car."  *Id.* at 162:9-18.  She stated that she was not resisting, but as part

of police procedure, the officers held her by the arms hard and, in doing so, were hurting her.  *Id.*

at 162:19-163:1.  Finally, she admitted that she was not carried, but she walked "willingly."  *Id.*

at 163:2-12.  Upon being placed in the squad car, Artiles claimed several times at her deposition

that one of the officers stepped on her toe.  *See id.* at 162:9-12; 165:4-8; 167:9-13; 168:1-17.
The Court discusses this issue more fully below.  After being placed in the car, Artiles stated that
the ride to HPD was "uneventful."  *Id.* at 169:15-17.

Upon arriving at the precinct, Carpenter led Artiles into a processing room and
handcuffed her left hand to a bar under the desk in the center of the room. The next 2½ hours
were captured by the stationary security camera, and the resulting videotape is part of the record.
The Court discusses the officers' and Artiles' actions in more detail below insofar as they are
relevant to the legal analysis of plaintiff's constitutional claims.  Briefly, however, during the
first 45 minutes she was there, while Carpenter was completing certain processing forms
(including a *Miranda* waiver form), Artiles can be seen:

- Visibly pounding on the desk and pointing her finger at the
  officers;

- Reaching over the desk, taking the telephone, and placing it
  behind her back;

- Ripping a processing form out of Carpenter's hands; and

- Continuously attempting, ultimately successfully, to slip her
  hand out of the handcuffs.

After these acts, approximately thirty minutes after being brought into the processing
room, Carpenter removed Artiles' handcuffs to take photographs and fingerprints.  A struggle
ensued, discussed more fully below.  During the struggle, Vitanza entered the room to assist, and
at some point Artiles admittedly bit Vitanza on the arm.  In response, Vitanza punched Artiles in
the arm in an attempt to make her stop biting him.  *Id.* at 193:5-194:11.  While these events are
undisputed, neither the bite nor the punch can be seen on the video, as it occurred below the
desk.

For approximately the next two hours, the video shows no further significant confrontations between Artiles and the officers. A police matron can be seen on the video giving Artiles a cup of water, and assisting her in drinking it because of her handcuffs. During this period, one of the officers called Judge O'Toole again to add charges of assaulting a police officer, which the judge approved. No recording of this call exists. Bail was also increased to $25,000 cash. McCarthy Aff. Ex. F. The officers eventually escorted Artiles out of the processing room and proceeded to drive her to MCCF.[8]

After being picked up by a family member from MCCF (which individual picked her up and when is unclear), Artiles was treated at St. Claire's Hospital for a fractured toe. Eventually, Artiles resolved the criminal charges against her by agreeing to, and being accepted in, a pretrial intervention program. *See* Artiles Aff. ¶ 55; Compl. ¶¶ 51-52. She filed this action on November 13, 2006 [D.E. # 1], and amended her complaint three times [D.E. # 2, 3, 4] before amending it for the final time on April 11, 2007 [D.E. # 16]. After discovery, this motion followed.

---

[8] Because plaintiff has dropped her claims against MCCF and its employees, the Court does not discuss the facts with respect to her conduct there. *See supra* note 1. Before the officers took Artiles to MCCF, she claimed that they had not let her have a drink of water or use the bathroom. *Id.* at 188:14-19; 201:11-15. But the video, as stated, clearly shows that the matron had helped Artiles drink a cup of water. Carpenter's report that he and Vitanza would not let her use the bathroom because it would be better to let her use it at MCCF a few minutes away is consistent with her testimony. McCarthy Aff. Ex. E. The report states that Artiles told him that "she was just going to go to the bathroom in the patrol car." *Id.* Artiles did, in fact, urinate in the patrol car. She stated at her deposition, however, that it was because she "just couldn't wait anymore." Artiles 1/22/08 Dep. at 201:11-203:25.

18

## V.    DISCUSSION

### A.  *§ 1983*

42 U.S.C. § 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  The statute is not a substantive grant of federal rights; it provides only a remedy in federal court for deprivations of rights secured by independent sources of federal constitutional or statutory law.  *Estate of Smith v. Marasco*, 318 F.3d 497, 505 (3d Cir. 2003); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1999).  Thus, the Court must first address this threshold inquiry: "'[W]hether the plaintiff has [suffered] a deprivation of a constitutional [or statutory] right at all.'"  *Donahue v. Gavin*, 280 F.3d 371, 378 (3d Cir. 2002) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)).   As set out earlier in this Opinion, Artiles asserts four claims under § 1983:  (1) false arrest; (2) excessive force; (3) malicious prosecution; and (4) claims against Gallagher and the Township of Hanover under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  Each of Artiles' four claims concerns the Fourth Amendment to the federal Constitution, which proscribes "unreasonable searches and seizures," and states that "no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing . . . the persons . . . to be seized." U.S. Const. amend. IV.  The Court discusses Artiles' claims *seriatim*.

19

1.  <u>False Arrest</u>

Under the Fourth Amendment, an arrest without probable cause is a constitutional violation actionable under § 1983. *See Walmsley v. Philadelphia,* 872 F.2d 546, 551 (3d Cir. 1989) (citing *Patzig v. O'Neil*, 577 F.2d 841, 848 (3d Cir. 1978) ("Clearly, an arrest without probable cause is a constitutional violation actionable under § 1983.")). Here, Artiles asserts that her arrest on November 20, 2004 was unlawful for essentially three reasons: (1) there existed no substantive probable cause for her arrest; (2) Judge O'Toole was not a neutral and detached magistrate when he authorized the warrants, in part because Vitanza falsified information supporting the issuance of the warrants; and (3) the warrants were procedurally defective. *See* Compl. ¶¶ 19, 29-31, 37, 39, 57-58; Pl. Opp. Br. at 14-23.

a.  Probable Cause

To determine whether probable cause existed and a valid arrest was effected, the Court looks to the law of the state where the arrest took place, *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) (citing *Ker v. California*, 374 U.S. 23, 37 (1963) (plurality opinion)), and examines the elements of the crime or crimes at issue that gave rise to the arrest. *Wright*, 409 F.3d at 602. New Jersey follows the common law of arrest, which makes permissible an arrest with or without a warrant when an officer has "probable cause to believe that a crime has been or is being committed and that the person to be arrested has committed or is committing it." *State v. Fariello*, 71 N.J. 552, 568 (1976). "Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Marasco*, 318 F.3d at 514 (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). Probable cause means more than a mere suspicion, but it need not prove guilt

20

beyond a reasonable doubt. *Hill v. California*, 401 U.S. 797, 804 (1971) ("Sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment. . . ."); *see also Orsatti*, 71 F.3d at 482-83.  A probable cause inquiry is an objective one, based on "the facts available to the officers at the moment of arrest . . . ."  *Beck v. Ohio*, 379 U.S. 89, 96 (1964); *Edwards v. City of Philadelphia*, 860 F.2d 568, 571 n.2 (3d Cir. 1988).  Evidence that may later turn out to be insufficient to prove guilt at trial may still be sufficient to find the arrest occurred within the bounds of the law.  *Henry v. United States*, 361 U.S. 98, 102 (1959).  So long as the officers had some reasonable basis to believe Artiles had committed a crime, the arrest is justified by probable cause.  *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994).

"[In] analyzing false arrest claims, a court to insulate a defendant from liability need find only that '[p]robable cause . . . exist[ed] as to any offense that could be charged under the circumstances.'"  *Johnson v. Knorr*, 477 F.3d 75, 84-85 (3d Cir. 2007) (quoting *Barna*, 42 F.3d at 819) (alteration added in *Knorr*).  Thus, defendants need show probable cause only as to any one of the initial charges for which Artiles was arrested to defeat her false arrest claim.  Finally, although the question of probable cause in a § 1983 action is usually one for the jury, *Marasco*, 318 F.3d at 514 (quoting *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998)), courts "may conclude 'that probable cause did exist as a matter of law if the evidence, viewed most favorably to the plaintiff, reasonably would not support a contrary factual finding,' and may enter summary judgment accordingly."  *Id.* (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)).[9]  Based on the record evidence, this is such a case.

---

[9] Artiles cites *Patzig*, suggesting that a probable cause determination in a § 1983 action must always be submitted to a jury.  Pl. Opp. Br. at 21.  The Third Circuit in *Patzig* held that "[w]e are convinced that the question of probable cause in a § 1983 damage suit is one for the jury."  *Patzig*, 577 F.2d at 848.  *Patzig* is a 31-year old case.  Since then, the Third Circuit has

Artiles was charged and arrested for a violation of N.J.S.A. § 2C:33-3(e), which makes it a fourth-degree criminal offense if one "knowingly places a call to a 9-1-1 emergency telephone system without purpose of reporting the need for 9-1-1 service." N.J.S.A. § 2C:33-3(e). She was also charged with harassment, in violation of N.J.S.A. § 2C:33-4(a), which proscribes, with purpose to harass another, the making of a communication "anonymously or . . . in offensively coarse language, or any other manner likely to cause annoyance or alarm." N.J.S.A. § 2C:33-4(a).

The record supports Vitanza's determination that Artiles had violated both of these criminal statutes on the evening of November 20, 2004. First, during Artiles' initial call to HPD—which she does not now dispute making—she refused to give her name upon making the noise complaint because she claimed that when her neighbors called the police on her, they were not required to identify themselves. McCarthy Aff. Ex. B. Dispatcher Collora's immediate call to Vitanza within HPD to complain about Artiles' call demonstrates the following: (1) that the officers' suspicions concerning Artiles were heightened (because Collora knew that it had been Artiles who called, despite the allusion to 3505 Appleton Way); and (2) Vitanza was alerted to the emerging situation. Second, the recording of the conversation clearly indicates Artiles hesitating when giving her relative location. *Id.* ("I am a resident of 3505 Whipa – Uh, Eden Lane – and I am sick and tired of hearing these people."). This corroborates her apparent attempt to disguise her identity while making the noise complaint. Third—and most important—she stated that she was a resident of 3505 Appleton Way, an obvious misrepresentation (she lived at 3502 Appleton Way). *Id.* Consequently, when the officers arrived at the Liccardos' residence, they initially believed that two different individuals had complained of the noise, as is evidenced by the 911

_____

demonstrated in a number of subsequent cases (e.g., *Marasco*, *Montgomery,* and *Sherwood*) that *Patzig* did not state an immutable rule of law.

dispatcher's response to Artiles' second call, as well as the officers' conversation with the Liccardos. *See* McCarthy Aff. Ex. B; Katherine Dep. at 12:17-15:10. Vitanza discovered this fact upon returning to police headquarters and comparing the two initial calls. Fourth, Artiles escalated the character of the conversation, injecting combativeness into what was purportedly a simple request for police assistance. McCarthy Aff. Ex. B. All of these circumstances factor into the probable cause equation.

Minutes later, Artiles called the HPD's 911 emergency line. While the call itself indicates nothing more than a request for police response to an emergency, when compared to Artiles' first call and reviewed in light of the officers' subsequent investigations and Artiles' later calls, its import becomes clear. Artiles alludes to the fact that she is at her correct address (she refers to her "neighbors upstairs"), creating the impression that two separate complaints were being made about the Liccardos. Critically, she stated that she believed an "emergency" was occurring, and that there was a "serious problem up there." *Id.* At her deposition, Artiles admitted that she used these terms when she called the 911 line. Artiles 1/22/08 Dep. at 134:23-24.

Defendants do not contend that these calls constituted probable cause to believe that Artiles had violated § 2C:33-3(e) at that point in time. *See* Hershkowitz Aff. Ex. B at 86:6-21. But, consistent with their previous responses to the condominium complex, the officers responded and investigated. They began at the Liccardos' residence, the site complained of, where they determined that there was no emergency. McCarthy Aff. Ex. E; Brian Dep. at 10:12-17:24; Katherine Dep. at 12:17-15:10. Vitanza also knocked on the Liccardos' neighbor's door at 3505 Appleton Way—from where Artiles had purportedly made the first call—spoke with the occupant, and found no signs of emergency. McCarthy Aff. Ex. E. The officers then proceeded

23

to Artiles' residence to continue the investigation, but she refused to answer the door.  Viewed objectively, after discovering no exigent emergency and given plaintiff's failure to present herself to the officers when they arrived at her door, it was not unreasonable to believe at that time that Artiles had knowingly placed a 911 call "without purpose of reporting the need for emergency services."  N.J.S.A. § 2C:33-3(e).

Thereafter, Artiles continued to call HPD.  Berating them for having knocked on her door when the noise complaint was made for 3506 Appleton Way, Artiles first claimed—falsely—that she did not know who had called 911, and then proceeded to threaten the officers—twice—with a lawsuit that would make her a multimillionaire.  McCarthy Aff. Ex. B.  This apparent ulterior motive is further evidence that would permit a reasonable officer lawfully to believe that Artiles had called 911 "without purpose of reporting the need for emergency services."  N.J.S.A. § 2C:33-3(e).  Probable cause thus existed as a matter of law.[10]

Artiles asserts several arguments about why probable cause was lacking, but none has merit.  She argues that the officers had a pre-existing animus against her that motivated her arrest.  *See* Pl. Opp. Br. at 1 ("[B]ecause of a pre-existing animus toward [p]laintiff based on previous encounters, the defendant police officers sought to criminalize [p]laintiff's behavior by soliciting a warrant for her arrest . . . when the true facts . . . would not have made out probable cause for an arrest."); *id.* at 4 ("Plaintiff alleges that her arrest for making . . . 'false' 9-1-1 calls was commenced . . . by [defendants] . . . not because [p]laintiff had committed th[at] or any other

---

[10] For the same reasons, the Court finds as a matter of law that probable cause existed to believe that Artiles repeatedly called HPD with a purpose to harass, in violation of N.J.S.A. § 2C:33-4(a).  Her false assertion that she lived at 3505 Appleton Way, her threats of lawsuits that would make her a multimillionaire, and her failure to respond to the officers' investigation support this charge.

crimes, but because defendant Vitanza, who harbored a previous animosity toward [p]laintiff, became irritated with her for seeking police assistance and he wanted to teach her a lesson."); *id.* at 5 ("[T]he impetus for the actions taken by defendant Vitanza was the pre-existing animus harbored toward [p]laintiff by defendant Vitanza, and by defendant Martino"); *id.* at 7 ("It also underscores and supports the [p]laintiff's position that all of the actions taken against her on the night in question were motivated by the pre-existing animus of defendants Vitanza and Martino"). "Improper motive, however, is irrelevant to the question whether the objective facts available to the officers at the time reasonably could have led the officers to conclude that [Artiles] was committing an offense." *Marasco*, 318 F.3d at 514; *see also Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). Thus, even if the officers did harbor resentment against Artiles based on their prior encounters with her, the objective facts available to them at the relevant time constituted probable cause, which is the appropriate focus for the legal analysis.[11]

---

[11] Artiles cites *Bielevicz v. Dubinon*, 915 F.2d 845, 853 (3d Cir. 1990) to support her position that "the facts would enable a jury to draw an inference that [p]laintiff was arrested and incarcerated because of personal animus." Pl. Opp. Br. at 21 (citing *Bielevicz*). *Bielevicz* is inapposite, however, as it pertains to the causation requirement for municipal liability under *Monell*, not whether probable cause existed for an arrest. *Bielevicz*, 915 F2d at 853. The Third Circuit found in *Bielevicz* that a directed verdict under *Monell* in favor of a municipality was improper because there was sufficient evidence of a causal link between a police department custom of arresting individuals on public drunkenness charges without probable cause and the particular public drunkenness arrests of plaintiffs. *Id.* In making the link, the court stated that there was ample evidence of the defendant officers' pre-existing animus against the plaintiffs, noting that the officers' knowledge of the departmental custom emboldened them to make the unconstitutional arrests. *Id.* The court was not analyzing, however, the existence or absence of probable cause when it concluded that there was evidence of *Monell* causation. (A jury had already rendered a false arrest verdict against the individual officers). As the procedural posture of *Bielevicz* was different from the instant case, the court did not address *Whren* or its progeny,

Much like her first argument, Artiles next takes issue with the officers' ability subjectively to assess whether she had the requisite *mens rea* to violate the statute.  She states that "based on the denials by [the Liccardos] that they had . . . been making noise, the police made a subjective determination about [Artiles'] state of mind, ascribing to [her] a criminal intent in making the complaint."  Pl. Opp. Br. at 17; *see also id.* at 4 ("The record establishes that the 'probable cause' to arrest was based on a <u>subjective determination of the operation of</u> <u>[p]laintiff's mind by defendant Vitanza</u>, in that [he] subjectively determined that [she] really didn't believe that her neighbors were disturbing her.") (underline in original).  She asks whether there is "some objective body of knowledge of which [p]laintiff is deemed to have been on notice to distinguish [the 911 call] as a <u>criminally prohibited</u> call[?]"  *Id.* (underline in original). She continues, querying whether a

> police officer should be permitted to criminalize behavior by
> divining, or interpreting, the operation of a citizen's mind,
> especially when, as in the case at bar, that police officer has a
> manifest pre-existing animus toward the citizen being arrested, and
> when the determination of probable cause depends on the police
> officer's own subjective appreciation of the facts[?]

*Id.* at 18.

The Court has already addressed the pre-existing animus issue—it is immaterial to a probable cause inquiry.  As to criminal intent, Artiles need not have had an intent to commit a crime, for that is not an element of § 2C:33-3(e).  There are but two *mens rea* components in the statute:  (1) "knowingly" making a call to a 911 telephone system; and (2) doing so "without

_____

and thus the Third Circuit's discussion of pre-existing animus does not help Artiles prove that probable cause was lacking in the face of the officers' alleged pre-existing animus against her.

purpose" of reporting the need for 911 emergency services.  N.J.S.A. § 2C:33-3(e).[12]  Artiles

admits that she knowingly called 911.  Artiles Aff. ¶ 18.[13]  And the Court has concluded above

that the circumstances permitted the reasonable inference that she did so without purpose of

reporting the need for emergency services.  Quoting *Burdick, Law of Crimes*, the Supreme Court

of New Jersey has stated:

> [A] criminal intent is not necessarily an intent to do wrong; the
> voluntary doing of a forbidden act may be enough. At common
> law, the mental element required in every crime is the voluntary
> exercise of the will, that faculty of the human mind which has the
> power of choice, and in the exercise of that power wishes, desires,
> determines or intends. The criminal law forbids and commands
> various things. If one chooses not to obey, and voluntarily carries
> that choice, or will, into effect by some act, the two necessary
> elements of crime are present, and the liability to punishment is
> incurred. This voluntary choice of doing what the law has declared
> to be crime constitutes what the law calls a bad or evil intent,
> otherwise called malice. The Legislature may make the doing of
> the prohibited act criminal or penal, regardless of a corrupt or
> criminal purpose or even knowledge of the illegal character of the
> act; and in such case only the doing of the proscribed act need be
> shown.

*State v. Monahan*, 15 N.J. 34, 49-50 (N.J. 1954) (internal quotations and citations omitted).

Because an intent to commit a criminal act is not necessary to violate the statute, the officers

were not required to determine whether Artiles had intended to commit a crime. Moreover,

Artiles' argument that the officers subjectively determined that Artiles had violated §§ 2C:33-

3(e) and 2C:33-4(a) is unpersuasive.  Of course defendants subjectively determined that Artiles

had violated the statutes; any statute with a *mens rea* requirement necessitates such a decisional

---

[12] There is only one *mens rea* element in the New Jersey harassment statute:  The defendant must
have a "purpose" to harass another.  N.J.S.A. § 2C:33-4(a).

[13] Despite now conceding that she did in fact call 911 at 8:32 p.m., at her deposition, Artiles
repeatedly denied that she made this first 911 call.  Artiles 1/22/08 Dep. at 132:6-137:8.

progression.  Police must make actual decisions based on the facts appearing before them.  To the extent this reality required defendants subjectively to assess whether or not Artiles called 911 with a true purpose of reporting an emergency (and whether or not she made the calls with purpose to harass), this Court sits to review their assessment for objective reasonableness.  But the Fourth Amendment does not, nor could it, outlaw subjective decisionmaking on the part of police officers, especially where a subject's state of mind is in issue.  *See Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997) (quoting *United States v. Glasser*, 750 F.2d 1197, 1206 (3d Cir. 1984), *cert. denied*, 471 U.S. 1018 (1985)) ("We have stated that 'the determination that probable cause exists for a[n] . . . arrest is fundamentally a factual analysis that must be performed by the officers at the scene. It is the function of the court to determine whether the objective facts available to the officers at the time of arrest were sufficient to justify a reasonable belief that an offense had been committed.'").

Finally, Artiles protests that the officers concluded that she had violated § 2C:33-3(e) based on the statements of the very neighbors about whom she had called HPD to complain.  *See* Pl. Opp. Br. at 5 ("[S]imply because the neighbors did not admit to defendant Vitanza that they had been making noise, does not meant [sic] there was no noise."); *id.* at 9 ("[Y]es, amazingly, the neighbors did <u>not</u> confess to defendant Vitanza that they had been disturbing [Artiles] by making banging noises.") (underline in original).  But the question presented here is whether the officer's determination that Artiles had violated §§ 2C:33-3(e) and 2C:33-4(a) was *reasonable*, not whether the Liccardos' testimony could prove Artiles' guilt beyond all reasonable doubt.  Having:  (1) investigated the Liccardos' residence and taken their statements; (2) found no emergency there (Artiles offers no evidence to suggest that this determination was wrong or even unreasonable); (3) spoken with the occupant at 3505 Appleton Way; (4) been unsuccessful at

eliciting an appearance or statement from Artiles; (4) reviewed the tapes of the first two calls; and (5) received Artiles' subsequent calls, it was objectively reasonable for the officers to believe that Artiles had violated the statutes.  Whether the Liccardos would be persuasive before a jury is beside the point.  For these reasons, the Court finds that the record evidence would not permit a rational factfinder to find that probable cause was lacking.

### b.  Arrest Warrants

Artiles also attacks the sufficiency of the complaint warrants pursuant to which she was seized.  Pl. Opp. Br. at 16-17.  Because she was arrested in her home and no exigent circumstances were present, arrest warrants were required.[14]  *Payton v. New York*, 445 U.S. 573, 576 (1980); *see also United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009) ("The general rule is that the warrantless entry into a person's house is unreasonable *per se*.").  She argues first that the warrants were procedurally and facially defective because Vitanza and Judge O'Toole did not comply with the statutory prescriptions for obtaining telephonic warrants, and that the warrants charged her with calling 911 multiple times when she had only called the emergency line once at that point.  Second, she challenges Judge O'Toole's neutrality in assessing probable cause.  The Court addresses the second claim first.

According to Artiles, Judge O'Toole was "palpably less than independent or impartial" and "would have authorized a warrant to arrest a 'ham sandwich'" had Vitanza asked him to.  Pl. Opp. Br. at 1, 9.  Hyperbole aside, the warrants were not defective based on Judge O'Toole's probable cause assessment.  The Fourth Amendment requires "that inferences of probable cause

---

[14] Artiles does not challenge, nor could she, the fact that the complaint warrants were not personally served upon her at her home.  *See Valdez v. McPheters,* 172 F.3d 1220, 1224 (10th Cir. 1999) (stating that a circumstance permitting officers to enter a home is the "*existence* of a valid arrest warrant," not possession of it) (emphasis added).

be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Shadwick v. Tampa*, 407 U.S. 345, 350 (1972) (internal citations and quotations omitted).  To satisfy this requirement, "an issuing magistrate must meet two tests. He must be neutral and detached, and he must be capable of determining whether probable cause exists for the requested arrest or search."  *Id.*  Once "detachment and capacity do conjoin, the magistrate has satisfied the Fourth Amendment's purpose."  *Id.*

Artiles does not argue that Judge O'Toole was incapable of making a probable cause determination, but claims only that he was "exceedingly reverential" to Vitanza, *i.e.*, that he "did not remotely appear to undertake an independent review of the facts in support of probable cause before authorizing the warrant."  Pl. Opp. Br. at 9.  The recording of the telephone call from Vitanza to Judge O'Toole demonstrates otherwise.[15]  "Whatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from activities of law enforcement."  *Shadwick*, 407 U.S. at 350.  To be sure, Vitanza referred to himself as "Tony" and Judge O'Toole, obviously familiar with Vitanza, called him "Vito," but this does not undercut Judge O'Toole's detachment from the HPD or his neutrality in independently assessing probable cause.  McCarthy Aff. Ex. J.  Other than casting unsupported aspersions against the judge, "[t]here has been no showing whatever here of partiality, or affiliation . . . with prosecutors or police."  *Shadwick*, 407 U.S. at 350.  Contrary to Artiles' characterization of the

---

[15] Artiles argues that the "tone of the conversation" reveals as much as the words passed between Vitanza and Judge O'Toole.  Pl. Opp. Br. at 8.  That the two men were familiar with each other in a small municipality is apparent—and unsurprising.  The "tone" of the conversation, however, is perfectly consistent with Judge O'Toole's comprehension and swift analysis of probable cause.  What is important is content, and it easily passes muster.

phone call, Judge O'Toole gave a measured response to Artiles' conduct, and Vitanza was accurate in his report of her conduct.[16]  Suggesting that Artiles might not open the door, Judge O'Toole stated that although he could authorize the door be broken down, that kind of police response did not seem necessary.  McCarthy Aff. Ex. J.  (And contrary to Artiles' claims of animus on Vitanza's part, Vitanza did not disagree.)  The judge  indicated that breaking the door down might be proper if there were an emergency or "life and limb cut situation," but that it did not sound like that was the case, and that he didn't want to "escalate" the situation for fear that Artiles "might take a swing" at one of the officers.[17]  *Id.*  The conversation reveals an exchange between a seasoned judge and an officer making a front-line report to him, and adequately fulfills the Fourth Amendment's requirement that probable cause be judged by a neutral and detached arbiter.

Artiles next attaches error to the fact that the complaint warrant charged her with calling HPD's 911 emergency line twice, when at the time Vitanza completed the forms, she had only called 911 once.  Pl. Opp. Br. at 8-11.  Artiles argues further that Vitanza and Judge O'Toole

---

[16] As a corollary to her argument that Judge O'Toole did not adequately assess probable cause, Artiles also argues that Vitanza misrepresented the facts to him.  Vitanza did at one point in the conversation erroneously state that Artiles had "called the desk three more times," but he corrected himself moments later, making clear that she, in fact, called only twice more.  In context, Vitanza accurately conveyed to Judge O'Toole the fact that Artiles called the regular HPD dispatch line, then called 911, then called two more times after officers investigated the initial complaints.  In any event, Artiles' assertion that Vitanza suggested to Judge O'Toole that she had made multiple 911 calls at that time is patently contradicted by the recording.  McCarthy Aff. Ex. J.

[17] Artiles makes much out of Vitanza's reference to her as a "pain in the ass," but this does not undermine Judge O'Toole's assessment.  *See* Pl. Opp. Br. at 8-9; Hershkowitz Aff. Ex. E at 5-6.  Vitanza referred to Artiles as a "pain in the ass" only in the context of justifying his belief that Artiles should not be released on her own recognizance.  By that point, Judge O'Toole had already authorized her arrest, and had thus concluded (properly) that probable cause existed.

31

failed to comply with New Jersey Court Rule 3:2-3(b), the provision for obtaining telephonic

warrants.  Pl. Opp. Br. at 16.  Defendants do not respond to these arguments in their reply brief.

Notwithstanding, the record establishes that Artiles had called the 911 emergency line once prior

to Vitanza's phone call to Judge O'Toole to obtain the arrest warrants. The arrest warrant

charging her with making a false 911 call charges her with making two such calls.  McCarthy

Aff. Ex. F.   Further, the separate complaint warrant charging Artiles with harassment

inaccurately states that Artiles "called the [HPD] for a total of 5 times."  *Id.*  (She had called a

total of four times at that point in time).  Thus, each warrant contained minor inaccuracies as to

the charges Artiles faced.[18]

In addition, neither warrant technically complied with New Jersey Court Rule 3:2-3(b),

which provides in pertinent part:

> A judge may issue an arrest warrant on sworn oral testimony of a
> law enforcement applicant who is not physically present. Such
> sworn oral testimony may be communicated by the applicant to the
> judge by telephone, radio or other means of electronic
> communication.   The judge shall administer the oath to the
> applicant. Subsequent to taking the oath, the applicant must
> identify himself or herself, and read verbatim the Complaint-
> Warrant . . . and any supplemental affidavit that establishes
> probable cause for the issuance of an arrest warrant.

N.J. Ct. R. 3:2-3(b).  Judge O'Toole did not administer an oath to Vitanza, nor did Vitanza read

verbatim the accusations in the complaint warrant (for it had not been completed).  McCarthy

Aff. Ex. J.  For this reason, the Court accepts *arguendo* that the warrants are procedurally

---

[18] Artiles also attacks the warrants because there "is no memorialization from the judge . . .
setting forth the judge's perceived basis for finding probable cause.  Pl. Opp. Br. at 9 (underline
in original).  This is unpersuasive.  The warrants describe with particularity the person to be
seized—Deborah Artiles.  McCarthy Aff. Ex. F.  The Court "know[s] of no further requirement
that the warrant articulate the foundation for the finding of probable cause."  *Mills v. Graves*, 930
F.2d 729, 732 (9th Cir. 1991).

deficient.  The issue remains whether this procedural deficiency salvages plaintiff's false arrest claim.

c.  Savings Provision for Defective Warrants and
Good Faith Exception

Summarizing the above, the Court has found that as a matter of law, probable cause existed to believe that Artiles violated N.J.S.A. §§ 2C:33-3(e) and 2C:33-4(a) on the night of November 20, 2004.  It has concluded further that Judge O'Toole did not abandon his neutral and detached role as a magistrate in assessing probable cause, and that Vitanza did not misrepresent the relevant facts to Judge O'Toole when requesting the warrants.  Finally, the Court has found that in certain aspects, there is a genuine issue as to whether the arrest warrants were procedurally defective.  But this last finding does not preclude summary judgment.

First, as a matter of New Jersey law, Artiles' arrest pursuant to the technically deficient warrant would not have procured her release or acquittal.  A companion rule to the one that places the procedural compliance of the warrants in doubt provides a savings provision for technical insufficiencies or irregularities in arrest warrants.  New Jersey Court Rule 3:3-4 provides that "[n]o person arrested under a warrant . . . shall be discharged from custody or dismissed because of any technical insufficiency or irregularity in the warrant or summons . . . ." N.J. Ct. R. 3:3-4(a); *cf.* N.J. Ct. R. 3:3-4(b) (If "it appears that the warrant executed . . . does not properly name or describe . . . the offense with which the defendant is charged, . . . the court shall not discharge or dismiss the defendant but shall forthwith cause a new complaint to be filed and thereupon issue a new warrant or summons.").  Thus, the warrants' minor factual inaccuracies—which again, appeared on the warrants but were not inaccurately conveyed to Judge O'Toole—did not invalidate the arrest.  Nor did Judge O'Toole's failure to administer an

33

oath to Vitanza undercut the seizure's constitutional legitimacy.  *See State v. Egles*, 308 N.J. Super. 124, 130 (App. Div. 1998) ("R[ule] 3:3-4[(a)] provides extraordinarily broad authority to amend a warrant," and "sub-section (b) goes even further . . . .").

Second, under the "good faith" exception pursuant to *United States v. Leon*, 468 U.S. 897 (1984), federal courts have declined to repudiate warrants when they were supported by probable cause but were rendered procedurally defective because the magistrate failed to administer an oath to the affiant-officer over the telephone.  *See, e.g., United States v. Henderson*, 471 F.3d 935, 937 (8th Cir. 2006); *United States v. Hessman*, 369 F.3d 1016, 1022-23 (8th Cir. 2004); *United States v. Clutchette*, 24 F.3d 577, 579-82; *United States v. Moore*, 968 F.2d 216, 223 (2d Cir. 1992) (citing *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988)); *Unites States v. Richardson*, 943 F.2d 547 (5th Cir. 1991); *United States v. Allard*, No. 94-1370, 1995 U.S. App. LEXIS 259, at *1-11 (6th Cir. 1995).[19]  These cases upheld the warrants on the theory that the deficiencies were mere "clerical errors" or "oversights" that did not affect their vitality.  *See Henderson*, 471 F.3d at 937; *Matias*, 836 F.2d at 747.

The Court finds the reasoning above instructive.  Where otherwise valid warrants are technically deficient for an affiant's failure to take an immediate telephonic oath, yet do not violate the  Fourth Amendment in the criminal context, *a fortiori* they do not save a false arrest claim in a § 1983 action.  In *Mills v. Graves*, 930 F.2d 729 (9th Cir. 1991), the Ninth Circuit

---

[19]  The *Leon* good faith exception does not apply if:  (1) the issuing judge is misled by information the affiant knows or should know is false; (2) when the issuing judge completely abandons his judicial role; (3) when the affidavit includes so little indicia of probable cause that official belief in its existence is entirely unreasonable; and (4) when the warrant is so facially deficient that the executing officer cannot reasonably presume it to be valid.  *Leon*, 468 U.S. at 923.  The Court has already found that Judge O'Toole was not misled by Vitanza and did not completely abandon his judicial role.  The other two scenarios are likewise not present here.

affirmed summary judgment in a § 1983 action in favor a police officer who had executed a telephonic search warrant without being administered an oath, in violation of Washington state-court rules. *Mills*, 930 F.3d at 734.  The court upheld the warrant notwithstanding the fact that the officer did not take an oath until five days after the warrant issued. (Vitanza, in contrast, signed the complaint warrants upon oath immediately after his conversation with Judge O'Toole, when he completed the forms). *Id.*; McCarthy Aff. Ex. F.  The court compared the deficiency to cases involving the federal analogue for telephonic warrants, where those "purely technical violations of [the federal rule do] not render the warrant constitutionally invalid in the absence of bad faith or prejudice." *Mills*, 930 F.3d at 734 (citing *United States v. Luk*, 859 F.2d 667, 671-72 (9th Cir. 1988); *United States v. Ritter*, 752 F.2d 435, 441 (9th Cir. 1985)).  It concluded that, "[g]iven the evidence [the officer] had gathered and the technical nature of the violation, coupled with [his] later affirmation of his statement (this time under oath), it would be unduly harsh to strip him of his [qualified] immunity for relying on the warrant." *Id.*

In this case, the Court finds that Judge O'Toole's failure to administer an oath to Vitanza and Vitanza's failure to recite verbatim the allegations appearing in the warrants did not vitiate the warrants' otherwise valid issuance.  The failure was nothing more than an "oversight" that was effectively and quickly cured when Vitanza was administered an oath when he completed the complaint warrants after obtaining authorization.  The Court concludes that under the circumstances, no Fourth Amendment violation occurred as a result of the technical deficiency in the procurements of the arrest warrants.[20]

---

[20] Given the Court's conclusion, it need not address the second prong of the qualified immunity analysis.  It notes, however, that given the savings provision in New Jersey Court Rule 3:3-4 (discussed above) making it debatable whether the warrant was valid under state law, Vitanza did not act unreasonably or violate clearly established federal law for failing to take an oath

d.  Conclusion

In sum, the Court finds the following:  (1) that probable cause to believe Artiles violated N.J.S.A. §§ 2C:33-3(e) and 2C:33-4(a) on November 20, 2004 existed as a matter of law; (2) that Judge O'Toole properly acted as a neutral and detached magistrate in finding probable cause based on the facts as Vitanza accurately presented them; (3) that there was technical non-compliance with the protocol governing issuance of the warrants based on Judge O'Toole's clerical failure to administer an oath to Vitanza, and that trivial factual inaccuracies appeared on the face of the warrants; (4) that the savings provision in New Jersey Court Rule 3:3-4 cured any deficiency in the warrants, thus validating Artiles' arrest; (5) that in any event, federal case law has upheld as constitutional the execution of warrants despite procedural failure to administer a telephonic oath; (6) that as a result, no constitutional violation occurred when the defendant officers procured and executed the arrest warrants; and (7) that even if a constitutional violation had occurred, the officers are shielded by qualified immunity.  For these reasons, summary judgment on Artiles' false arrest claim is appropriate.

---

while on the phone with Judge O'Toole.  Likewise, because they could not have known that Vitanza did not take the oath, Carpenter and Martino also acted reasonably in executing the warrants.  Therefore, even were the Court to conclude that the warrants were invalid and that Artiles' in-home arrest violated her constitutional rights, it would hold that the officers are entitled to qualified immunity on plaintiff's false arrest claim because they acted reasonably under the circumstances.  *See Berg v. County of Allegheny*, 219 F.3d 261, 273 (3d Cir. 2000) ("[W]e have generally extended immunity to an officer who makes an arrest based on an objectively reasonable belief that there is a valid warrant."); *Rogers v. Powell*, 120 F.3d 446, 456 (3d Cir. 1997) (concluding that a state trooper who was inaccurately told by another trooper that there was a warrant for the plaintiff's arrest was immune from suit)).

2.   Excessive Force

"When an 'excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment . . . .'"  *Sharrar v. Felsing*, 128 F.3d 810, 820 (3d Cir. 1997) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)).  "The proper test for evaluating an excessive force claim is therefore one of objective reasonableness," *id.*, which "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 821.  As in other Fourth Amendment contexts, this reasonableness analysis does not account for subjective motivations:  "The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 397 (citing *Scott* v. *United States*, 436 U.S. 128, 137-139 (1978)).   In pursuing this inquiry, the Court must be mindful of the fact that the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 396-97.  Thus, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *id.* at 396, because "'not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' is constitutionally unreasonable."  *Id.*   Bearing these principles in mind, the Court looks to the totality of the circumstances in assessing the officers' use of force.  At this posture, the Court must also resolve

all genuine factual disputes in Artiles' favor.  *Gilles v. Davis*, 427 F.3d 197, 207 (3d Cir. 2005)

(quoting *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004)).

The precise contours of Artiles' excessive force theory are unclear.  Her complaint

alleges that defendants used unconstitutionally excessive force during the arrest and at HPD

headquarters while Artiles was being processed.  Compl. ¶¶ 35-36, 38.  According to defendants,

at some point during this litigation Artiles abandoned any claim for excessive force arising out of

events at HPD headquarters, instead focusing on the injury to her toe, which she allegedly

sustained during the course of the arrest.  *See* Def. Br. at 3 ("Plaintiff's only theory of excessive

force arises out of her foot being stepped on . . . .  In the early stages of this litigation the

[p]laintiff alleged . . . excessive force while she was at police headquarters.  That claim has

apparently been abandoned . . . .").  It is true, as defendants assert, that the expert report

submitted by Dr. Paul McCauley (discussed more fully *infra*) gives only cursory attention to the

excessive force issues, and plaintiff's brief emphasizes Artiles' broken toe.  *See* Pl. Opp. Br. at

10-11, 23-24.  The affidavit that Artiles has submitted in opposition to defendants' motion,

however, indicates that she still intends to prosecute her excessive force claim insofar as it arises

out of the altercation at the police precinct.  *See* Artiles Aff. ¶¶ 38, 45.  Therefore, the Court

discusses the excessive force claim in both contexts.

### a.  Arrest

Artiles claims that defendants violated her Fourth Amendment rights by breaking her toe

during the course of the arrest.  Her initial theory was that her toe was fractured because one of

the officers stepped on it as they led her outside.  At her deposition, Artiles testified that as

Carpenter put her in the back of the squad car, "somebody stepped on my toe – smashed my toe,

because I had no shoes on."  Artiles 1/22/08 Dep. at 165:7-8.  She asserted further that as she

was being put in the back of the car, "somebody smashed a boot down on my toe – my toe got

smashed." *Id.* at 167:11-13.  Her deposition testimony continued as follows:

> Q.    All right, *You know that a boot landed on your foot*[?]
>
> A.    *Oh yeah.*
>
> Q.    And how can you rule out that your foot wasn't accidentally stepped on?
>
> A.    Because they were being really mean to me.
>
> Q.    Was that the sole basis for you to rule out an accidental step on the foot – they were being mean to you?
>
> A.    Yeah, the way they were manhandling me, I mean, they were, like, dragging me and shoving me – it wasn't done nicely, and there was no reason for it.
>
> Q.    It wasn't like you saw somebody come over with a boot and pretend it was a cockroach on the floor and get it, right?
>
> A.    Well, I wasn't looking down at the time, because my head was being pushed into the cop car.
>
> Q.    But you don't know or cannot rule out that it was an accidental step on your foot.
>
> A.    It didn't seem like an accident.
>
> Q.    Fair to say that you didn't see the maneuver of whoever's leg it was to land their boot on your foot?
>
> A.    Well, because my head was in the car –
>
> Q.    But you're not Superman, you can't see behind your head.
>
> A.    I know.
>
> Q.    I don't think he could, actually.  But you didn't see it?
>
> A.    No, it was all happening very fast.

*Id.* at 168:1-169-11 (emphasis added).

This evidence is the basis of her excessive force claim with respect to her theory that one of the officers smashed her toe with his boot.  As defendants point out, plaintiff admitted that her sole basis for believing that her broken toe was no accident is that the officers "were being really mean to [her]," "they were manhandling [her]," that "it wasn't done nicely," and that "it did not seem like an accident."  She admitted further that she did not see anyone step on her toe.  This falls short of evidence necessary to demonstrate a purposefully inflicted injury.  Furthermore, Artiles does not refute Brian Liccardo's testimony that Artiles was "hysterical" and was "yelling and screaming" while she was being taken to the police car.  Brian Dep. at 20:3-21:9.  Brian Liccardo also testified that as Artiles was being placed in the squad car, there did not appear to be any "physical altercation"; Artiles does not refute this.  Brian Dep. at 20:3-21:9.  Katherine Liccardo likewise testified that Artiles was placed in the squad car without physical incident; Artiles does not refute this either.  Katherine Dep. at 20:19-21:9.  Her proofs, therefore, are deficient to show deliberate assaultive conduct.  The toe nonetheless was broken.  If plaintiff is complaining that the officers were negligent, she fails to establish a constitutional violation. *See Brice v. City of York*, 528 F. Supp. 2d 504, 518 (M.D. Pa. 2007) ("Negligent, accidental, or unintentional conduct that has the coincidental effect of producing a seizure will not substantiate an excessive force claim.") (citing *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989)); *Damiani v. W. Deptford Twp.*, No. 07-2884, 2008 U.S. Dist. LEXIS 17581, at *7 (D.N.J. Mar. 7, 2008) ("[Section] 1983 does not recognize claims of simple negligence" as they relate to excessive force.).[21]  Only plaintiff's conjecture that the toe injury was not accidental because

---

[21]  The parties do not dispute that as a result of her arrest, Artiles' was "seized" for Fourth Amendment purposes.  Nevertheless, because Artiles does not claim that the arrest—taken as a

"they were really being mean to me" takes the officers' conduct into the realm of unconstitutional conduct.

Additionally, Artiles' testimony shows that she did not have shoes on, a fact supported by Carpenter's report and Martino's deposition.  McCarthy Aff. Exs. A at 165:7-8; E.  Martino testified that he asked plaintiff to allow him to put her shoes on for her because her hands were cuffed and because she refused to "push" them on herself, but that it "wasn't working very well."  Hershkowitz Aff. Ex. C at 29:2-30:10.  Artiles argues in her brief that "[a]lthough there was no need for defendant Martino's 'assistance,' nonetheless [he] took it upon himself to help [p]laintiff . . . put on her shoes.  He states that she was not able to push the shoes on herself; which raises the question of <u>how the shoes got to [p]laintiff's feet</u> to test that theory."  Pl. Opp. Br. at 7 (underline in original).  But, again, Artiles herself stated that she did not have shoes on when she was escorted outside.  This evidence shows first that it was plaintiff's conduct that caused her not to have shoes on when she was escorted to the police car.  Second, the brief sets up the suggestion that Artiles did have shoes on and asks the Court to wonder about how that happened—a useless exercise when Artiles herself admitted at her deposition that she was unshod.

Finally, plaintiff is flat-out inconsistent her brief and affidavit, where she claims that her toe was not fractured as a result of someone stepping on it, notwithstanding her deposition testimony to the contrary.  Instead, she now asserts that when Martino attempted to assist with her shoes, "[*o*]*bviously* [he] had taken hold of [p]laintiff's feet, and [p]laintiff can reasonably

---

whole—was excessive, but instead argues that a single discrete movement (stepping on her toe) constituted the excessive force that caused her constitutional injury, the cases cited above analyzing whether a seizure had occurred as a result of a particular negligent movement pertain with equal force here.

infer that this is when her toe was broken."  *Id.* (emphasis added).  In her affidavit, Artiles attempts to explain her shift in theories as follows:

> 31.   Because I was frightened – I believe I was in shock –  I was *not certain how my toe was broken*; at one point I had concluded that it was stepped on when I was being physically taken from my home by the officers.

> 32.   However, *I am informed by my attorney* that documents and statements discovered in this case, including defendant Martino's own admissions, establish that defendant Martino physically grabbed and manipulated my foot while I was being restrained by defendant Carpenter, who handcuffed me, and *I now believe this is how my toe was broken.*

Artiles Aff. ¶¶ 31-32 (emphasis added).  Having informed his client as she describes above, Artiles' attorney argues to the Court that "there is a very reasonable inference, consistent with the facts establishing [defendants'] pre-existing animus, that defendant Martino . . . used physical force sadistically to hurt [p]laintiff."  Pl. Opp. Br. at 24.

Artiles may not use speculative theories advanced by her attorney as evidence.  *She* was the one present at the scene; her conflicting factual accounts are not an appropriate basis upon which to draw favorable inferences (and most certainly do not form a basis for inferring that "physical force [was used] sadistically"!).[22]  In response to a question at her deposition—more than three years after the incident—whether she knew that a boot landed on her toe, she responded, "Oh yeah."  Artiles 1/22/08 Dep. at 168:1-3.  Assembling the above evidence, Artiles:  (1) was uncertain how her toe was broken at the time of the incident, Artiles Aff. ¶ 31; (2) was certain on January, 22, 2008 (the date of her deposition) that her toe was broken outside

---

[22]  Moreover, despite her attorney's alleged possession of record evidence establishing Martino's "sadistic" use of force, *see* Artiles Aff. ¶ 32, no such evidence is before the Court.

the residence as a result of one of the officers stomping on it while placing her in the squad car, Artiles 1/22/08 Dep.. at 165:7-169:11; and (3) now believes, after discussions with her attorney, that it was actually *Martino* who broke her toe *inside* the condominium.

Even indulging this eleventh-hour theory, Artiles has fallen far short of proffering specific facts—supported by record evidence—that would suggest Martino purposely wrenched her foot while placing shoes on her feet.   Contrary to her claim, Martino's deposition testimony indicates that he did not actually touch her feet.   His testimony makes clear that he *requested* first to assist Artiles with her shoes, that "it wasn't working very well," and as a result, the officers brought her shoes with them to the precinct.   Moreover, Artiles' newly asserted factual account conflicts with her previous deposition testimony that:   (1) Martino did not even enter the residence while she was being arrested; (2) it was *Hermans* who retrieved the slippers; and (3) the officers did not even give her an opportunity to put her shoes on.   Artiles 1/22/08 Dep. at 159:5-22.   If, according to her prior testimony, Martino was not in the residence, Hermans had the slippers, and neither officer permitted her to put shoes on, how could it now be "obvious" that Martino sadistically had taken hold of her feet and broken her toe?   Pl. Opp. Br. at 7.

The Court must resolve genuine factual disputes in plaintiff's favor in determining whether the officers' use of force was objectively reasonable.   *Gilles*, 427 F.3d at 207.   But it is also Artiles' affirmative burden, as the non-moving party here, to provide "*specific facts* showing that there is a genuine issue for trial."   *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (emphasis added).   Artiles does not proffer a consistent set of facts or arguments that would permit a rational inference to be drawn in her favor.   Moreover, her contradictory theories demonstrate that she does not know how her toe was broken; who, if anyone, broke it; and in what manner.   Rank speculation and irreconcilable theorizing do not create a genuine dispute of fact.   *See*

43

*Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) ("[U]nsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment."); *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 894 (7th Cir. 2003) ("[I]t is clear that conclusory assertions, unsupported by specific facts made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a motion for summary judgment."); *Galati v. D & R Excavating, Inc.*, 04-1684, 2006 U.S. Dist. LEXIS 28723 (D. Ariz. May 9, 2006) ("To defeat a motion for summary judgment, affidavit testimony unsupported by other evidence in the record must set forth facts sufficiently specific for the factfinder to make the conclusion urged by the proffering party." (citing *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993))).  Because she has not sufficiently pointed to facts that would permit a reasonable inference that any officer maliciously or recklessly caused her broken toe, Artiles has not met her burden, and summary judgment is appropriate on this point.

### b.  Precinct

The Court need spend little time on this portion of Artiles' excessive force theory, assuming she still espouses it as a triable issue:  The video speaks for itself.  Throughout the roughly 2½-hour period in which Artiles remained in the police processing room, she indisputably heightened the officers' awareness level with her actions.  Slamming on the desk, pointing a finger at the officers' and police matron's faces, removing the telephone off the hook and placing it behind her back, and ripping a booking form from Carpenter's hand are, by themselves, only minor provocations, but they provide context.  She also took two major provocative actions that are clearly captured on the videotape.  First, throughout the video Artiles can be seen attempting to escape the handcuffs that bound her to the desk, and she ultimately

succeeded in wriggling free.  Although this feat did not result in a major altercation, it certainly underscores the atmosphere of unrest that Artiles had created.

Second, the video demonstrates that it was Artiles, not Carpenter, who instigated the struggle on the floor.  Consistent with his report (and after Artiles had already escaped the handcuffs once), Carpenter removed the handcuffs to fingerprint and photograph her, at which time she crossed her arms.  McCarthy Aff. Ex. E.  The video shows Carpenter directing Artiles to the far wall, but Artiles remained seated.  Again, consistent with his report, Carpenter took hold of Artiles' wrist, and she responded by flailing wildly.  Continuing to struggle with Carpenter, Artiles propelled herself to ground, eventually writhing free of Carpenter's grasp. Vitanza then entered the room to assist Carpenter.  The two men picked her up by each arm, with Vitanza holding her left and Carpenter holding her right, and returned her to the chair at the desk. Artiles continued to struggle, again falling to the floor below the desk.  The parties agree that Artiles bit Vitanza, and that Vitanza punched her on the arm.  Finally, the officers were able to return Artiles to the chair and handcuff her to the desk.  The entire encounter lasted one minute, fifteen seconds.

The Court is obliged to draw all reasonable inferences in Artiles' favor, but it is not duty-bound to draw inferences that video evidence "blatantly contradict[s]".  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Here, Artiles' deposition testimony is contrary to any reasonable interpretation of the video evidence.  For instance, she claimed that the encounter occurred because she wanted to go to the bathroom, so she stood up from her seat at the desk and asked to use the bathroom, at which time Vitanza—who she claimed was in the room—charged her and bear-hugged her.  *Id.* at 183:15-186:18.  But the video plainly disputes this account:  At the time Vitanza entered the room to assist Carpenter in returning her to the desk, Artiles had already begun struggling with

Carpenter on the floor.   Other inconsistencies in plaintiff's deposition testimony further demonstrate why no reasonable jury could believe her version of events.   She claimed that at no point while she was in the processing room did the officers attempt to take her photograph or fingerprints.   Artiles 1/22/08 Dep. at 190:17-191:12.   Again, the video contradicts her story; it unmistakably shows Carpenter setting up a camera at the far right of the screen, walking over to Artiles and uncuffing her, and then pointing toward the camera.   This was seconds before Artiles began the struggle about which she now complains.

The Court need not honor "visible fiction," but must "view[] the facts in the light depicted by the videotape."   *Scott*, 550 U.S. at 381.   The force that Vitanza used in helping Carpenter pick her up—"violently" or not—was a reasonable effort to return her to the chair. She stated that, as Vitanza grabbed her "violently," she "[i]nstinctively . . . reacted by biting [his] hand whereupon he punched me several times."   Artiles Aff. ¶¶ 40-41. As to the punches, Artiles emphasizes that they "were underlined by Vitanza," Artiles Aff. ¶ 45 (underline in original), but this does not save her claim.   Indeed, Vitanza punched her so she would release her bite, a fact which Artiles does not seriously dispute.[23]   *See* McCarthy Aff. Ex. E; Artiles Aff. ¶¶ 42-45. Rather, she complains that "there was no reason he should have punched me several times, or that he should have grabbed me in the first instance so hard that it instinctively caused me to bite his hand (in my own self-defense)."   Artiles Aff. ¶ 45.   But the force levied upon her was a measured response to her own provocative and volatile actions.   And the bruising that she

---

[23] While her affidavit might be read to imply that she "instinctively" bit Vitanza to defend against his punches, *see* Artiles Aff. ¶¶ 42-45, her own deposition testimony and the video belie this interpretation.   Her testimony, read in its entirety, makes clear that she "nipped" Vitanza so that he would release his grasp of her arm, *not* because he had punched her first.   Artiles 1/22/08 Dep. at 183:21-184:11, 190:1-6, 193:5:195:15; *see also* Artiles Aff. ¶ 45.

sustained from Vitanza's punches does not change the analysis.  *See id.* Ex. D.  "[B]alanc[ing]

the nature and quality of the intrusion on the individual's Fourth Amendment interests against

the importance of the governmental interests alleged to justify the intrusion," *United States* v.

*Place*, 462 U.S. 696, 703 (1983), the Court finds that defendants' responses reasonably met their

legitimate need to maintain order and officer safety while booking a confrontational and

unpredictable arrestee.  Further, the intrusion on Artiles' Fourth Amendment rights—a firm grip

and one or more punches to the arm (causing bruising) in response to her bite—was a justified

response, taken to meet the obvious governmental interests created by Artiles and depicted in the

videotape.[24]  *See Sharrar*, 128 F.3d at 822 (discussing presence or absence of injury as relevant

consideration in balancing governmental needs and individual civil rights when assessing

excessive force claim).

Because the record discredits Artiles' version of events so that no reasonable jury could

find that the officers utilized unconstitutionally excessive force against her, judgment will be

entered in favor of the individual officers on her excessive force claim.

### 3.  Malicious Prosecution

To recover on a claim of malicious prosecution under § 1983, Artiles must prove five

elements: (1) the defendants initiated a criminal proceeding against her; (2) the criminal

proceeding ended in her favor; (3) the proceeding was initiated without probable cause; (4) the

defendants acted maliciously or for a purpose other than bringing her to justice; and (5) she

suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a

---

[24] Again, like the Supreme Court in *Scott*, this Court is "happy to allow the videotape to speak
for itself."  *Scott*, 550 U.S. at 379 n.5. The events in the processing room as conveyed by the
videotape, however, are aptly summarized in the expert report submitted by Dr. Richard Celeste
on behalf of defendants.  McCarthy Aff. Ex. L at 16-20.

legal proceeding.  *Kossler v. Crisanti*, 564 F.3d 181, 186 (3d Cir. 2009) (citing *Marasco*, 318 F.3d at 521).

        Artiles cannot satisfy at least two of the required elements for this federal claim.  First, the Court has found above that probable cause existed for her arrest; it follows, then, that her subsequent prosecution was not initiated without probable cause.   Second, Artiles herself concedes that her malicious prosecution claim lacks merit because she accepted a pretrial intervention program in order to dispose of the criminal charges against her.  *See* Artiles Aff. ¶ 55; Compl. ¶¶ 51-52.   Because the criminal proceeding must be resolved in a manner "that indicates the innocence of the accused in order to satisfy the favorable termination element," *id.* at 187 (citing *Donahue*, 280 F.3d at 383) (listing six possible bases for finding a "favorable termination"), and pretrial intervention is not such an indication, her claim fails.  *See also Gilles v. Davis*, 427 F.3d 197, 211 (3d Cir. 2005) (holding that expungement under a similar program was not a favorable termination because the program "imposes several burdens upon the criminal defendant not consistent with innocence"); *Lindes v. Sutter*, 621 F. Supp. 1197, 1200 (D.N.J. 1985); *Antoine v. Rucker*, No. 03-3738, 2006 U.S. Dist. LEXIS 46824, at *23-24 (D.N.J. Jul. 11, 2006) (Martini, J.) (granting summary judgment on malicious prosecution claim because "a successful completion of pretrial intervention under New Jersey statutes, resulting in the dismissal of the indictment, is not termination of prosecution favorable to the accused for purposes of either a civil rights action for malicious prosecution or a state tort claim based on that same cause of action.").  Summary judgment on her federal malicious prosecution claim is therefore granted.

4. *Monell* Claims Against Gallagher and the Township

Artiles also asserts constitutional claims against the Township under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  Compl. ¶¶ 73-79. A municipality may be held liable under *Monell* for the constitutional torts of its employees not through a theory of *respondeat superior*, but when its "policymakers ma[k]e a deliberate choice from among various alternatives to follow a particular course of action, where the policy reflected deliberate indifference to the constitutional rights of the municipality's inhabitants, and where the policy was the moving force behind a constitutional violation."  *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1149 (3d Cir. 1995).  In other words, a *Monell* claim "must be founded upon evidence that the government unit itself supported a violation of constitutional rights." *Bielevicz*, 915 F.2d at 850 (citing *Monell*, 436 U.S. at 691-95).  Therefore, *Monell* liability inures to a municipality "only when 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'"  *Id.* (quoting *Monell*, 436 U.S. at 694).

A governmental "policy" may be shown by evidence that a "'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)).  A "custom," conversely, "can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Bielevicz*, 915 F.2d at 850 (citing *Andrews*, 895 F.2d at 1480); *see also Anela v. City of Wildwood*, 790 F.2d 1063, 1067 (3d Cir. 1986) (quoting *Monell*, 436 U.S. at 691) (Practices "'so permanent and well settled' as to have 'the force of law' [are] ascribable to municipal

49

decisionmakers."). "Custom" includes "knowledge of, and acquiescence to, a practice." *Watson v. Abington Twp.*, 478 F.3d 144, 156 (3d Cir. 2007) (citing *Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir. 1989)). Submitting evidence of an unlawful policy or custom, though, is not enough to recover against a municipality: "A plaintiff bears the additional burden of proving that the municipal practice was the proximate cause of the injuries suffered." *Bielevicz*, 915 F.2d at 850 (citing *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984)). The requisite causation is established where a plaintiff demonstrates a "plausible nexus" or "affirmative link" between the municipality's custom and the specific deprivation of constitutional rights at issue. *Id.* So long as the "causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Id.* at 851 (citing *Black v. Stephens*, 662 F.2d 181, 190-91 (3d Cir. 1981), *cert. denied*, 455 U.S. 1008 (1982)).

At the outset, the Court agrees with defendants that Artiles' *Monell* claim fails as a result of the dismissal of her underlying constitutional claims. *See Pittsley v. Warish*, 927 F.2d 3, 9 n.4 (1st Cir. 1991) ("In order to have a viable § 1983 claim against a municipality, a state actor must first commit an underlying violation."); *Halpern v. City of Santa Cruz*, 178 F. App'x 683, 685-86 (9th Cir. 2006) (relying on *City of Los Angeles v. Heller,* 475 U.S. 796, 798-99 (1986), in finding that a "constitutional violation by [defendant] officers is a prerequisite to a claim pursuant to *Monell* . . . ."). Nonetheless, the Court addresses the merits of plaintiff's *Monell* claim and the expert report in support of it.

Artiles does not argue that the Township had an official policy to violate citizens' constitutional rights. Instead, her complaint claims that Gallagher and the HPD had actual or constructive knowledge of the officers' "propensity for lack of truthfulness, use of excessive

50

force, and for their likely failure to protect citizens from the unconstitutional conduct," and that a result of their failure effectively to "screen, hire, train, supervise[,] and discipline" these officers, the Township and Gallagher "evinced a deliberate indifference to the need to properly train, supervise, reprimand[,] or discipline" HPD officers for various deficiencies, which ultimately led to Artiles' constitutional injuries.  Compl. ¶¶ 74-77.  The lynchpin of Artiles' theory is that Gallagher and the Township failed properly to *discipline* HPD officers for various infractions. *See* Pl. Opp. Br. at 27.  In support of her position, she has submitted the expert report of Dr. Paul McCauley (the "McCauley Report"), a criminologist specializing in police practices. Hershkowitz Aff. Ex. E.   In his report, Dr. McCauley concludes that HPD "has significant management and operation problems . . . [that] have manifested themselves in several ways, including record, information, and communication deficiencies all of which impact officers and organizational performance and the quality of life for citizens of Hanover Township."  *Id.* at 4. In support of this conclusion, the McCauley Report lists all citizen complaints lodged against the three defendant officers, the outcome, and what (if any) disciplinary action was taken.  *Id.* at 7-9. The report focuses on the complaints filed against Vitanza, who had worked at HPD longer than Carpenter and Martino.  *See id.* at 7. ("I have focused, initially on [Vitanza's] hiring, promotion, retention, discipline, and training.").  The Court will not discuss each incident, but reviews them generally.

According to the McCauley Report, beginning in 1988, Vitanza was subjected to disciplinary action ten times.  *Id.* at 7-8.  Four of these actions resulted in oral reprimands, two in written warnings, one in a training class for dealing with difficult people, two in short suspensions, and in one instance counsel was assigned to defend Vitanza (in 1990), but the outcome of the charge is unclear.  *Id.*   A qualitative assessment, however, indicates that the

51

majority of these disciplinary actions were taken in response to policy infractions such as: improper evidence handling, abusing overtime procedures (which resulted in one of the suspensions), using radar to issue speeding tickets on the highway after being instructed not to (which resulted in the other suspension), misusing a police vehicle, and failing to use the audio equipment during a traffic stop.  Hershkowitz Aff. Ex. E at 7-8.  Vitanza was instructed to attend the class for dealing with difficult people after he was charged with harassment/improper demeanor, but the charge itself was "not sustained."[25]  Vitanza was also charged several times with conduct related to his demeanor, variously labeled in the report as "rude," "insulting," "mistreatment," "disrespectful," "conduct unbecoming," and "harassing."  *Id.*  Some of these complaints were determined to be "unfounded," some were "not sustained," and one incident, labeled "conduct" was sustained, which resulted in a written warning.  *Id.*  A complaint was filed against Vitanza for "sexual misconduct" in 1998, but this charge was determined to be "unfounded," *i.e.*, false or without a factual basis.  *Id.* at 8.  Critically, on only two occasions during the 14-year period between 1990 and November 20, 2004 were complaints filed against Vitanza accusing him of conduct relevant to the incident here:  once for false arrest, and once for use of excessive force.  Both were determined to be "unfounded."  *Id.*

A review of complaints against Martino and Carpenter reveals that Martino was reprimanded on six occasions for the following:  twice for "[failure to appear for a] court appearance," once for "performance (eating at console)," once for a "raised voice—pointed

---

[25] When complaints are filed against HPD officers, an Internal Affairs Investigation ("IAI") results in one of four determinations:  "Sustained"—Evidence sufficient to support allegation; "Not Sustained"—Insufficient evidence to either prove or disprove allegation; "Exonerated"—Incident occurred but was lawful or proper; and Unfounded—Allegation is false or not factual.  Hershkowitz Aff. Ex. E. at 13.

finger (conduct to public)," and once each for "performance conduct-courtesy" and "fail[ure] to sick call." *Id.* at 9.   Martino was also suspended for one day for failing to appear for a court appearance.   Hershkowitz Aff. Ex. E at 9.   Other charges against Martino appear as follows: "demeanor," "improper comments," "failing to complete reports," "harassment," "demeanor," "rude," and "off-duty conduct."   *Id.*   These charges were either not acted upon or were ones for which Martino was "exonerated."   *Id.*   As for Carpenter, he faced no charges or IAIs before the November 20, 2004 incident with Artiles, and faced six investigations afterward.   He was "exonerated" in each.   *Id.*

Martino did face one serious disciplinary action stemming from his off-duty actions on November 5, 2003 in a Totowa, New Jersey bar wherein one patron waived a firearm and another was injured.   *Id.*; Hershkowitz Aff. Exs. C at 48:13-55:20; L.   In this incident, Martino was involved in an altercation with a patron and was thereafter removed by security personnel. Hershkowitz Aff. Exs. C at 51:2-52:24; L.   When Totowa police officers responded to reports that one of the patrons in the bar had brandished a gun, Martino "attempt[ed] to evade police authorities by hiding by/behind a dumpster . . . ."   Hershkowitz Aff. Ex. L.   Martino was thereafter questioned by the Totowa police officers, and ultimately by HPD Lieutenant Mark Roddy.   He was charged internally by HPD with being "not forthcoming" and "less than truthful" regarding his knowledge of the involvement of the firearm at the bar.   *Id.*   The charge recommended a 30-day suspension without pay.   *Id.*   The charges were "sustained," but the penalty was reduced to a one-week suspension without pay and a reprimand.   Hershkowitz Aff. Ex. E at 9.

Using these events, the McCauley Report attacks the investigative, monitoring, and disciplinary system at HPD.   *Id.* at 10.   Focusing on Vitanza's disciplinary history, the report

53

complains that HPD "knew or should have known of the[] complaints [against Vitanza] and made an effort to assess [his] fitness to continue employment as a sergeant and/or as a police officer." *Id.* Further, it claims that when the three officers "exhibited a potential pattern of performance issues and problems dealing with community members, no positive, corrective, supervisory, and/or training measures were taken to improve performance." *Id.* The report states that "[h]ad [HPD] taken reasonable steps to evaluate Sgt. Vitanza at appropriate times during his career, it is likely he would not have been retained, or not promoted, or if promoted, demoted or terminated prior to November 20, 2004," implying that he therefore would not have been in a position to "take actions against Ms. Artiles, as he did." *Id.* at 11.

Much of the McCauley Report is devoted to demonstrating the inadequacy of the IAI system within the Hanover Police Department. It questions the methods of internal investigations, asserting, *inter alia*, that "target officers were not interviewed," "IAI files are incomplete," and that "most files do not have verbatim, sworn interviews of the parties." *Id.* at 12-13. It admits, however, that "the number of complaints received against an officer is determined by numerous factors," including the number of arrests an officer makes, which often is driven by the officer's assignment and motivation. Hershkowitz Aff. Ex. E at 13. Despite this, Dr. McCauley states that it is his opinion that what he views as the deficiencies in the IAI system in place at HPD "reflect a deliberate indifference to the direction, training, and supervision of [HPD] officers and the safety and well-being of the citizens with whom these officers were, and are, likely to come into contact." *Id.* at 14. Dr. McCauley concludes that had HPD instituted an "Early Warning System" designed to detect patterns of problematic police officer behavior [and] performance, and had they undertaken to institute both "positive" and "negative" discipline when officers misstepped, they would have been alerted to the fact that

54

Vitanza was "motivated, aggressive, [a] risk-taker, and a rule-bender," and would have been able to remedy Vitanza's deficiencies as a police officer accordingly. *Id.* at 15-16. Even accepting the report's conclusion that the HPD's IAI system was deficient, plaintiff's *Monell* claim fails.

"A custom of failing to investigate citizen complaints may provide a basis for municipal liability if 'a policy-maker (1) had notice that a constitutional violation was likely to occur, and (2) acted with deliberate indifference to the risk.'" *Brice v. City of York*, 528 F. Supp. 2d 504, 518 (M.D. Pa. 2007) (quoting *Hernandez v. Borough of Palisades Park Police Dep't*, 58 F. App'x 909, 912 (3d Cir. 2003)); *see also Beck v. City of Pittsburgh*, 89 F.3d 966, 973 (3d. Cir. 1996).

In *Beck*, the Third Circuit reversed the district court's directed verdict in favor of the City of Pittsburgh, which was the only defendant then in the case.[26] Notably, writing for the court, Judge Rosenn expressly did not discuss the causation prong of the *Monell* claim, but limited the analysis to whether a reasonable jury could have determined that the city was deliberately indifferent to the potential for its officers committing constitutional torts. *Beck*, 89 F.3d at 972 n.6. At issue was whether a police officer used excessive force in arresting the plaintiff, who alleged that the officer drew his firearm, smashed it into the plaintiff's face, and struck the plaintiff with it at least six times during the course of the arrest. *Beck*, 89 F.3d at 968. Four excessive-force complaints had been filed against that particular officer during the three years before the plaintiff's arrest. *Id.* at 969. One complaint stated that the officer hit the complainant's face with a billy club after he was placed under arrest. *Id.* at 970. Another

---

[26] The district court had bifurcated plaintiff's claims against the individual officer and the municipality. When the jury could not agree on a verdict against the individual officer, the court declared a mistrial, plaintiff subsequently dropped the case against the officer, and decided to proceed against the municipality only. *Beck*, 89 F.3d at 967.

complaint accused the officer of "push[ing the complainant's] face hard against the police vehicle" without any apparent reason for doing so.  *Id.* at 969.  Internal investigations of these complaints *unanimously* resulted in *no* discipline against the officer despite findings that the allegations of at least one of the complainants were "believable."  *Id.*  Unlike this case, the municipality's complaint system in *Beck* failed adequately to alert municipal policymakers of the individual officer's steady pattern of *unconstitutional* conduct because the city's internal investigations system handled each complaint as an independent occurrence.  *Id.* at 973. Complaints were not compared against one another to reveal patterned conduct.  *Id.*  These and other systemic problems rendered the citizen complaint process "sterile and shallow," incapable of either alerting policymakers to patterns of unconstitutional conduct or remedying constitutional violations once they occurred.  *Id*. at 973-74.

In *Brice v. City of York*, the plaintiff asserted a *Monell* claim against York and five individual police for the officers' alleged use of excessive force, and the city's failure to investigate previous complaints against the officers.  *See Brice*, 528 F. Supp. 2d at 505.  After discussing *Beck*—the "seminal case in the area of failure to investigate citizen complaints"—the district court distinguished it on two bases and granted summary judgment.  *Id.* at 518-22.  First, the court reviewed the particular complaints that had been filed against the defendant officers, and concluded that, contrary to the plaintiff's assertions, "the complaints do not present a pervasive pattern of constitutional violations by York City police officers."  *Id.* at 519.  Rather, the complaints were few and minor in nature; further, the complaints "collectively contain[ed] no more than one allegation of unconstitutional conduct against any single police officer."  *Id.* Second, the court found that the plaintiff had failed to demonstrate a causal link between any shortcomings in the city's internal investigations system and his alleged constitutional injury

because the alleged defects in the city's system were not "closely related to the ultimate [constitutional] injury" that he had alleged. *Id.* at 521 (quoting *Woloszyn v. County of Lawrence*, 396 F.3d 314, 325 (3d Cir. 2005) and citing *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 214 (3d Cir. 2001)).  Because the court concluded that "[n]one of the citizen complaints reveal[ed] multiple allegations of abusive behavior by any of the officers involved in [plaintiff's] arrest," it found that any "[o]ther evidence of the police department's incomplete compliance with its internal policies [was] simply sound and fury." *Id.* at 522.  It therefore held that the evidence did "not signify the direct causal link required for municipal liability under § 1983." *Id.*

Like the district court in *Brice*, this Court finds that the complaints against Vitanza, Carpenter, and Martino do not evince a deliberate indifference to a risk of *constitutional* deprivations of citizens' rights in the Township of Hanover.  Of all complaints made against the three officers that appear in the McCauley Report (other than those relating to the incident at issue here), at most three regard alleged unconstitutional conduct; all were alleged against Vitanza, and all were determined to be false or without factual basis, *i.e.*, "unfounded." McCarthy Aff. Ex. E at 7-9.  When every prior incident implicating the Constitution is dismissed as false or without factual basis, the municipality should hardly have been on notice that a "constitutional violation was likely to occur." *Brice*, 528 F. Supp. 2d at 518.  "[M]ere recitation of the number of complaints filed [does not] suffice to prove a policy or custom.  A plaintiff must show why those prior incidents deserved discipline and how the misconduct in *those cases* is similar to that involved in the *present action*." *Mariani v. City of Pittsburgh*, 624 F. Supp. 506, 511 (W.D. Pa. 1986) (citing *Strauss v. City of Chicago*, 760 F.2d 765, 769 (7th Cir. 1985)) (emphasis added).  Where charges were sustained against Vitanza during his 20 years of service, and where the sustained charges were "demeanor-based," the sum total was not of a quantity or

nature to put the municipality on notice.  Further, by focusing largely on Vitanza, the McCauley Report deflects attention away from the few and minor grievances that Carpenter and Martino faced.  Martino's poor behavior at a bar while off duty equally provided no forewarning of unconstitutional conduct on his part while on duty.  The Court also concludes that, as was the case in *Brice*, the complaints filed against the officers do not establish a "plausible" or "close link" between any deficiencies in the Township's IAI system and Artiles' alleged unconstitutional arrest.

Artiles' complaint asserts in rote fashion that the Township and Gallagher failed properly to train or supervise the defendant officers, and that *Monell* liability attaches for these reasons as well.  Compl. ¶¶ 73-79.  She does not advance this argument in her brief, however, but rests on her failure to discipline theory.  To the extent that failure to train or supervise claims still exist, the record evidence does not support them.  Neither she nor the McCauley Report goes to any length to assert why HPD's training or supervision protocols were constitutionally deficient. Where the policy or custom at issue is not itself is unconstitutional, courts require a "heavy, if not insurmountable" burden on a plaintiff to prove liability as a result of inadequate, as opposed to unconstitutional, training or supervision of police officers.  *See, e.g., Mariani*, 760 F.2d at 510 (citing *Gilmere v. City of Atlanta*, 774 F.2d 1495 (11th Cir. 1985) (en banc); *Vippolis v. Village of Haverstraw*, 768 F.2d 40 (2d Cir. 1985); *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985)).  Having not discussed at any length the training or supervision the defendant officers received, Artiles has not met her heavy burden to show that a failure to adequately train or supervise resulted in her injuries.

The Court holds as follows:   Artiles' constitutional rights were not violated; and notwithstanding that deficiency in Artiles' *Monell* claim, the prior complaints against the

58

defendant officers did not rise to a level that would alert Gallagher and the Township to future conduct of an unconstitutional nature, and thus the municipality was not deliberately indifferent to a risk that Artiles' rights would be constitutionally infringed.  Finally, the causal link between any deficiencies in the Township's IAI system and the constitutional injuries allegedly inflicted here *is* "too tenuous," *Bielevicz*, 915 F.2d at 851.  For all of these reasons, *Monell* liability does not attach.  Summary judgment on Count Five is therefore granted.

### 5.   Summary Judgment on All Federal Claims is Appropriate

The Court concludes that the officers are entitled to qualified immunity.  Harking back to the Court's discussion of *Wright*, *supra*, plaintiff has failed to establish sufficient evidence of a constitutional violation on her false arrest and excessive force claims, and so she has not met the first step of the qualified immunity inquiry.  On her malicious prosecution claim, she admits that she cannot satisfy the requisite elements of the claim, and thus it fails.  The *Monell* claim fails based on the finding that the officers' conduct was not unconstitutional; it fails on its own as well.  For all of these reasons, summary judgment as to Counts One, Two, and Five (plaintiff's federal claims) is granted in defendants' favor.

### B.   State-law claims

The remaining count in this case—Count Four—recites various state-law claims, and the Court declines to exercise continuing supplemental jurisdiction over them.   Count Four is therefore dismissed.  *See* 28 U.S.C. § 1367(c)(3); *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 444 (3d Cir. 1997) (whether to exercise supplemental jurisdiction after dismissing federal claims "is committed to the sound discretion of the district court.").

**VI.    CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted.   An order reflecting the Court's disposition accompanies this Opinion.


<u>/s/</u>  Katharine S. Hayden

Hon. Katharine S. Hayden
United States District Judge


Date:  August 6, 2009

60